*This opinion is subject to revision before final publication in the Pacific Reporter*

**2014 UT 15**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

ADRIANNA LUCERO,
*Appellant.*

No. 20090751
Filed May 13, 2014

Third District, Salt Lake
The Honorable Vernice Trease
No. 081906809

Attorneys:

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Att'y Gen.,
Salt Lake City, for appellee

Joan C. Watt, Salt Lake City, for appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE NEHRING, JUSTICE DURHAM,
JUSTICE PARRISH, and JUSTICE LEE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1 Following a jury trial, Adrianna Lucero was convicted of murder and child abuse for the death of her two-year-old son Alejandro Lucero (Alex). Alex died after his back was bent backwards, which snapped his spine and pulled apart his aorta. After initially telling detectives and others that she was the only one present with Alex at the time of his injuries, Ms. Lucero subsequently claimed—and now maintains—that the injuries

were caused by her boyfriend, Sergio Martinez. She appeals her convictions on several grounds: first, she claims that the trial court abused its discretion in admitting evidence of prior child abuse under Utah Rule of Evidence 404(b); second, she claims her defense counsel was ineffective in several regards, including that he failed to fully examine Battered Woman's Syndrome (BWS) as a defense; and third, she claims cumulative error. In the alternative, she requests that we remand for consideration of her rule 23B motion regarding ineffective assistance of counsel, which the court of appeals stayed due to the parties' stipulation pending the consideration of this appeal.

¶2    We hold that the trial court did not abuse its discretion in admitting evidence of prior child abuse under rule 404(b), and we adopt the majority rule that a preponderance of the evidence is required to admit evidence of prior bad acts. We also hold that defense counsel was not ineffective because the trial strategy he selected was objectively reasonable. Next, we revisit the court of appeals' decision to grant Ms. Lucero's rule 23B motion and vacate the court's Order to remand as moot. For these reasons, there was no cumulative error, and we affirm Ms. Lucero's convictions.

## BACKGROUND

¶3    Ms. Lucero is a young mother of three children: Alex, a twenty-three-month-old, and five-month-old twins, I.H. and I.C.. Ms. Lucero's boyfriend, Mr. Martinez, is the father of the twins but not the father of Alex. Ms. Lucero and Mr. Martinez's relationship was complicated—Ms. Lucero lived with her mother, but Mr. Martinez would visit frequently, and always on the weekends. Sometimes Ms. Lucero and the children would visit Mr. Martinez in his basement room, in a home where he lived with two other women. Mr. Martinez had a wife and children in Mexico and was living in the United States illegally, and Alex's father had already been deported to Mexico. Mr. Martinez would regularly send money to his family in Mexico and call them on his cell phone, which was a frequent point of contention between Ms. Lucero and Mr. Martinez. Their relationship was further complicated by Ms. Lucero's age. She was only seventeen years old and regularly took her children to a child-care program at her high school, where she was on track to graduate.

¶4    The parties provide differing accounts of Mr. Martinez's relationship with Alex, but Ms. Lucero had instructed Mr. Martinez to keep his distance from Alex; accordingly, Mr. Martinez refused to discipline Alex, and he maintained that

he never took care of Alex. At one point in their relationship, Ms. Lucero planned to take her children on a school field trip to the zoo. Though Mr. Martinez was supposed to take them to the bus, he arrived late and had to drive them to the zoo. After Mr. Martinez picked them up later that day, Ms. Lucero and Mr. Martinez got into a fight, which was sparked by the fact that Ms. Lucero had received text messages from a male friend. After Ms. Lucero pounded on Mr. Martinez's car, he kicked her in the leg, and she broke his windshield. Mr. Martinez was ultimately convicted of domestic assault for the altercation, but Ms. Lucero attempted to protect Mr. Martinez after he told her that he could be deported. Ms. Lucero had lost her temper on previous occasions as well when she had broken a phone and a computer screen.

¶5   About a week before his death, Alex began to have problems walking. Ms. Lucero took him to a clinic, but the doctor could not identify the cause. Ms. Lucero maintained that Alex was in her and her mother's care when he began to exhibit symptoms, but after Alex's death, Ms. Lucero was pressed by detectives about the prior injury and began to claim that Mr. Martinez was abusive to Alex. She also claimed that Alex's injuries arose after a fishing trip with Mr. Martinez that had taken place two or three days before Alex had trouble walking. Because Alex's difficulty with walking did not begin until several days after the fishing trip when Mr. Martinez was not present, a detective noted that her timeline of events did not make sense.

¶6   On August 24, 2008, Ms. Lucero brought Alex and I.C. to visit Mr. Martinez in his basement room. I.H. was in the hospital due to recurring seizures, and they had spent the day visiting with him. They ate dinner and began to watch a horror movie, as Alex slept beside them on the bed and I.C. slept in a car seat next to the bed. In the course of the evening, the two began to fight after Ms. Lucero picked up Mr. Martinez's phone and saw that Mr. Martinez had called his family in Mexico. At some point, Alex began to fuss. He was then taken into the next room to get some Jell-O where he sustained the fatal injury and began to exhibit seizure-like symptoms. Ms. Lucero and Mr. Martinez called 911 and attempted to administer CPR, but Alex was declared dead soon thereafter. Although both Ms. Lucero's and Mr. Martinez's accounts of what transpired that evening are mostly the same, they each blame the other for taking Alex out of the room to get Jell-O and for causing the fatal injury.

¶7    But Ms. Lucero did not always blame Mr. Martinez. In fact, in the hours following Alex's death, Ms. Lucero told eight different people, including two police officers and the 911 operator, that she was the one who took Alex to get Jell-O. And she told detectives the following day the same story—that *she*, and not Mr. Martinez—had taken Alex out of the room to get Jell-O and that he started experiencing seizure-like symptoms. Once the detectives informed her of the true, graphic nature of Alex's spinal injuries, and that they were not the result of a seizure, Ms. Lucero changed her story to indicate that it was instead Mr. Martinez who had taken Alex to get Jell-O. She told detectives that she had lied to keep Mr. Martinez from being questioned by officials because she feared that he might be deported. Ms. Lucero explained that she initially thought that Alex had an unexplained seizure like her other son, I.H., but now that she knew the real cause of Alex's death, she thought that Mr. Martinez must have been responsible for it. At trial, Ms. Lucero and Mr. Martinez blamed each other for inflicting Alex's fatal injury.

¶8    The State charged Ms. Lucero with murder and two counts of child abuse—the first for the prior spinal injury, and the second for the fatal injuries. During a preliminary hearing, the magistrate judge refused to bind Ms. Lucero over on the first child abuse count because she deemed the cause and source of the injury too speculative. Before trial, both parties filed motions under Utah Rule of Evidence 404(b) with the trial court to admit evidence of prior bad acts. The State moved to admit evidence of Alex's prior spinal injury, which the medical examiner had determined was consistent with the same backward-bending force on the spine. Ms. Lucero moved to admit evidence of the couple's altercation at the zoo to show she would lie to protect Mr. Martinez from deportation. After briefing and argument, the trial court granted both motions. But while both sides briefed the court on rule 404(b) for Ms. Lucero's motion to admit evidence of Mr. Martinez's prior assault, only the State briefed the court on rule 404(b) for the State's motion to admit evidence of the prior child abuse. Ms. Lucero did object orally to the admission of the evidence of the prior child abuse, arguing that it was not closely enough connected to her to be admissible.

¶9    During trial, the police interrogation video was played without any major redactions—and defense counsel did not object but rather wanted the jury to see the video in full. Before the video was played, the court read a stipulation to the jury that I.H., Ms. Lucero's son, had been hospitalized after suffering seizures, that doctors "have been unable to determine the cause," and that

4

"[n]o affirmative signs of non-accidental trauma have been identified." Ms. Lucero's counsel asked for this stipulation to counter an officer's insinuation in the video that Ms. Lucero had harmed I.H. as well.

¶10 The jury ultimately convicted Ms. Lucero of murder and child abuse, and the court sentenced her to concurrent prison terms of fifteen years to life and one to fifteen years. She then appealed to this court, and we transferred the case to the court of appeals. We later recalled the case after briefing but before oral argument. Ms. Lucero subsequently filed a rule 23B motion in the court of appeals for the trial court to take evidence on her ineffective assistance of counsel claims, which are premised on BWS. The court of appeals granted the motion, but the parties stipulated to stay the remand pending resolution of this appeal. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(i).

## STANDARD OF REVIEW

¶11 Ms. Lucero raises several issues on appeal, which we assess under different standards of review. She first challenges the trial court's admission of evidence under rule 404(b) of the Utah Rules of Evidence. "[W]e review a trial court's decision to admit evidence under rule 404(b) of the Utah Rules of Evidence under an abuse of discretion standard."[1] "However, in the proper exercise of that discretion, trial judges must 'scrupulously' examine the evidence before it is admitted."[2] Ms. Lucero then argues ineffective assistance of counsel based on several claimed deficiencies. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law" that the court reviews for correctness.[3] Finally, Ms. Lucero claims cumulative error. "Under the cumulative error doctrine, we will reverse [a jury verdict or sentence] only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had."[4]

---

[1] *State v. Killpack*, 2008 UT 49, ¶ 18, 191 P.3d 17 (internal quotation marks omitted).

[2] *State v. Widdison*, 2001 UT 60, ¶ 42, 28 P.3d 1278.

[3] *State v. Charles*, 2011 UT App 291, ¶ 18, 263 P.3d 469.

[4] *State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892 (alterations in original) (internal quotation marks omitted).

**ANALYSIS**

### I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE OF PRIOR CHILD ABUSE UNDER RULE 404(b)

¶12 Ms. Lucero first argues that the trial court committed several errors in admitting evidence of Alex's prior spinal injury. First, she claims that the trial court failed to "scrupulously examine" the evidence in the exercise of its discretion to admit evidence of prior child abuse under Utah Rule of Evidence 404(b).[5] Second, she claims that the evidence was not relevant because the State did not meet the requisite standard of proof for admissibility under rule 402. Third, and last, she claims that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under rule 403.

¶13 Evidence of prior bad acts must clear several evidentiary hurdles before admission—rules 404(b), 402, and 403. In *State v. Decorso*, we reviewed these rules and clarified the three-part test that trial courts must follow.[6] Stated succinctly, to be admissible, evidence of prior bad acts must be relevant and offered for a genuine, noncharacter purpose; furthermore, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. We add, as further clarified below, that matters of conditional relevance must also meet the preponderance of the evidence standard under Utah Rule of Evidence 104(b).

---

[5] We review each of Ms. Lucero's challenges under the 2009 version of the Utah Rules of Evidence, since this version was in effect at the time of trial. *See State v. Clopten*, 2009 UT 84, ¶ 37, 223 P.3d 1103. The rules were restyled in 2011, but the advisory committee notes make clear that these changes were purely stylistic in nature. UTAH R. EVID. 404 advisory committee note (2011) ("The language of this rule has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility."). As a result, our analysis under the 2009 rules "is equally applicable to the rules as they now stand." *State v. Richardson*, 2013 UT 50, ¶ 19 n.1, 308 P.3d 526.

[6] 1999 UT 57, ¶¶ 20–24, 993 P.2d 837.

*A. The Trial Court Properly Admitted Evidence of Alex's Prior Injury Under Rule 404(b)*

¶14 First, the trial court did not abuse its discretion when it admitted evidence of Alex's prior injury for the purpose of proving identity. Ms. Lucero claims that the State introduced evidence of Alex's prior spinal cord injury for an improper character purpose. To admit evidence of a prior act, the court must first determine that it is being introduced for a legitimate, noncharacter purpose.[7] Rule 404(b) of the Utah Rules of Evidence provides that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As we recently noted in *State v. Verde*, admitting evidence under rule 404(b) can often be problematic because of the "dual inferences" that evidence of prior acts can yield.[8] Although

---

[7] As an alternative basis for decision, the State argues that the evidence of the prior child abuse is part of the continuing narrative rather than an independent act. Since rule 404(b) applies only "to evidence that is *extrinsic* to the crime charged," *United States v. Mower*, 351 F. Supp. 2d 1225, 1230 (D. Utah 2005) (emphasis added), this would preclude applicability of the rule altogether. This is because rule 404(b) applies only to "other" acts—if the evidence of prior acts is "inextricably intertwined" with the crime that is charged, or if both the charged crime and the prior act are considered "part of a single criminal episode," then rule 404(b) would not apply. *Id.* Rather, the act would be considered part of the case narrative and have important probative value that bears directly on the crime charged.

This is not the case here. The prior instance of abuse is disconnected from the night in question, and although both instances of abuse were in close temporal proximity, the State never used the previous abuse as part of the "narrative" but rather specifically sought to use the evidence under 404(b) as a separate incident to prove identity.

[8] 2012 UT 60, ¶ 16, 296 P.3d 673.

evidence of a prior, similar act may bear heavily on establishing a perpetrator's identity, it may also yield an equally strong, and improper, propensity inference. To distinguish between these inferences, courts must make a "threshold determination" of the genuine underlying purpose for admission of the evidence.[9] The language of the rule is inclusionary, rather than exclusionary,[10] meaning that evidence may be admitted despite its negative propensity inference, but "[i]f such evidence is really aimed at establishing a defendant's propensity to commit crime, it should be excluded despite a proffered (but unpersuasive) legitimate purpose."[11] In other words, the evidence "must have real probative value, not just possible worth."[12] And though multiple purposes may be proffered, only one valid, noncharacter purpose is required.[13]

¶15 In seeking admission of prior acts for the purpose of proving "identity," parties are most often actually seeking to admit evidence of an intermediate inference, such as modus operandi,[14] that bears on the ultimate issue of identity. Here, the

---

[9] *Id.* ¶ 17.

[10] *Decorso,* 1999 UT 57, ¶ 24 ("Although [404(b)] is exclusionary with respect to other crimes evidence offered only to show the defendant's propensity to commit crime, it is an inclusionary rule with regard to other crimes evidence which is offered for a proper, noncharacter purpose."). The majority of states and federal circuits have held the same. DAVID P. LEONARD, THE NEW WIGMORE. A TREATISE ON EVIDENCE: EVIDENCE OF OTHER MISCONDUCT AND SIMILAR EVENTS § 4.3.2 (2013) [hereinafter WIGMORE ON EVIDENCE] ("Federal courts in all circuits have characterized the codified rule as inclusionary, and almost all states follow the same view." (footnote omitted) (listing cases)).

[11] *Verde*, 2012 UT 60, ¶ 17 (internal quotation marks omitted).

[12] *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985).

[13] *State v. Nelson-Waggoner*, 2000 UT 59, ¶ 22, 6 P.3d 1120 (discussing multiple purposes offered by the State for admitting evidence under rule 404(b) and stating that "[a]ny one of these [purposes] is a valid, noncharacter purpose to admit the evidence").

[14] In addition to modus operandi, the State has also raised the doctrine of chances as a ground for affirmance, and the parties

(continued)

essence of the State's argument was that Ms. Lucero's modus operandi proves identity.[15] To admit evidence of modus operandi, the trial court must determine that the prior act and the charged conduct are strikingly similar. In *United States v. Miller*, the court held that the "crucial consideration" in deciding whether to admit evidence of prior acts for the purpose of identity is the "likeness of the offenses . . . . The physical similarity must be such that it marks the offenses as the handiwork of the accused."[16] Stated differently, admissibility of prior acts for the purpose of identity requires "(1) a very high degree of similarity between the charged

---

contend at length on this point. While the State contends that the evidence can be admitted under the alternative theory of the doctrine of chances to prove identity, Ms. Lucero attempts to limit the doctrine of chances to evidence that is admitted to demonstrate "lack of accident." In any event, as in *State v. Verde*, the doctrine of chances "was not presented by the State in [Ms. Lucero's] trial," so "we reject it as a ground for affirmance" on appeal. 2012 UT 60, ¶ 46.

[15] The State argued "identity" rather than modus operandi, but as is often the case, the concepts are used interchangeably. *See, e.g., United States v. Goodwin*, 492 F.2d 1141, 1154 (5th Cir. 1974) ("The 'identity' exception . . . is used either in conjunction with some other basis for admissibility or synonymously with modus operandi." (footnote omitted)). It is more accurate to say that the State raised the theory of modus operandi to prove identity, as modus operandi is an intermediate theory used to prove the ultimate inference of identity. WIGMORE ON EVIDENCE, *supra* note 10, § 12.1.

[16] 959 F.2d 1535, 1539 (11th Cir. 1992) (internal quotation marks omitted); *see also* WIGMORE ON EVIDENCE, *supra* note 10, § 13.6 ("[U]ncharged misconduct evidence is admissible [t]o prove other crimes by the accused so nearly identical in method as to ear-mark them as the handiwork of the accused. Much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature." (second alteration in original) (internal quotation marks omitted) (quoting CHARLES T. McCORMICK, HANDBOOK OF THE LAW OF EVIDENCE § 157, at 328 (1954)).

and uncharged acts, and (2) a unique or singular methodology."[17] In analyzing the similarity between the two acts, courts consider a variety of indicators, including "the time lapse between the crimes, and whether the crimes occurred in the same general locality."[18]

¶16 Here, the trial court admitted the evidence for a proper purpose. It found that the "evidence was relevant to lack of mistake or injury, [and] knowledge and identity." While any one of these was a valid purpose for admission, the central—and only real contested issue at trial—was that of identity. To support its argument that Ms. Lucero caused the prior injury, the State presented evidence at trial that she was the only one with access to Alex when the prior injury occurred and that the two injuries were remarkably similar. Both injuries occurred along the spinal column and were caused by the spine being bent unnaturally. Both injuries also occurred within days of each other. The only real difference between the two injuries was the amount of force inflicted; more force was exerted in the latter case, which caused the spine to fatally snap and rupture Alex's aorta. Because the injuries and method used to inflict them were so highly similar, and because they occurred in such temporal proximity, the trial court properly admitted the prior injury as evidence of modus operandi for the purpose of proving identity.

### B. The Trial Court Properly Determined that the Evidence of Prior Abuse Was Relevant

¶17 Second, the trial court properly admitted the evidence of prior abuse as relevant to the issue of identity. Utah Rule of Evidence 402 requires that evidence be "relevant," which is defined in rule 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." At bottom, the rules require that evidence "tend[] to prove some fact that is material to the crime charged— other than defendant's propensity to commit crime."[19] Rule 404(b)

---

[17] JOHN E.B. MYERS, MYERS ON EVIDENCE OF INTERPERSONAL VIOLENCE CHILD MALTREATMENT, INTIMATE PARTNER VIOLENCE, RAPE, STALKING AND ELDER ABUSE § 8.10 (2011) (footnote omitted).

[18] *Id*.

[19] *Nelson-Waggoner*, 2000 UT 59, ¶ 19 (internal quotation marks omitted).

provides a list of possible relevant noncharacter purposes including intent, identity, plan, motive, opportunity, knowledge, and lack of mistake or accident. Evidence submitted for any of these purposes is relevant only if the purpose is contested[20] and "of consequence to the determination of the action."[21]

¶18 And even if evidence is relevant for a proper purpose, such relevance may be conditional; if the evidence of prior misconduct is uncharged and cannot be connected to a defendant, then the evidence is irrelevant even though a party may seek to admit the evidence for a proper purpose. This situation is governed by rule 104 of the Utah Rules of Evidence. Because the substance of rule 104 mirrors its federal counterpart,[22] we consider the federal construction of its rule as persuasive in our analysis.[23]

¶19 Matters of conditional relevance are decided under Utah Rule of Evidence 104 by both the judge and the jury. Rule 104(a)

---

[20] *See Verde*, 2012 UT 60, ¶¶ 24–26 (discussing the consequence of a stipulation on the admission of prior acts evidence, even though intent was clearly at issue).

[21] UTAH R. EVID. 401 (2009).

[22] FED. R. EVID. 104 (2009) (identical to Utah Rule of Evidence 104 (2009)). The Advisory Committee note to the amended version of the rules also states (with respect to Utah rules 104, 105, 401, 403, and 404(a) and (b)) that the "provision[s] [are] the federal rule[s], verbatim." Rule 402 is also substantively identical, except the Utah rule adds "the Constitution of the State of Utah."

[23] *Angel Investors, LLC v. Garrity*, 2009 UT 40, ¶ 19 n.9, 216 P.3d 944 (observing that where a state rule is "substantively identical to its federal counterpart," we "freely refer to authorities which have interpreted the federal rule" (internal quotation marks omitted)); *State v. Fedorowicz*, 2002 UT 67, ¶ 30 n.1, 52 P.3d 1194 ("Although the Federal Rules of Evidence are a separate body of law from the Utah Rules of Evidence, if the reasoning of a federal case interpreting or applying a federal evidentiary rule is cogent and logical, we may freely look to that case, absent a Utah case directly on point, when we interpret or apply an analogous Utah evidentiary rule."); *Hansen v. Heath*, 852 P.2d 977, 979 (Utah 1993) (noting that when a rule is "adopted verbatim," any "reference to federal cases and the Advisory Committee Note[s] . . . [are] pertinent to give meaning and effect to the Utah Rule").

provides that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court, subject to the provisions of Subdivision (b)." Rule 104(b) requires that

> [w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Under 104(a), the court may only allow the evidence to be submitted to the jury if there is "evidence sufficient to support a finding of the fulfillment of the condition [of fact]." Although it is the province of the jury under rule 104(b) to decide whether the "condition of fact" is fulfilled and to ultimately view the evidence as credible, it is the duty of the court to decide whether there is sufficient evidence upon which the jury could make such a determination. In *Huddleston v. United States*, the Supreme Court described the court's role in this situation and stated that to

> determin[e] whether the Government has introduced sufficient evidence to meet Rule 104(b), the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence.[24]

We agree with the Supreme Court's reasoning and interpret Utah Rule of Evidence 104 to require a judge to admit evidence when it determines that the jury could reasonably find matters of conditional fact by a preponderance of the evidence. In the context of rule 404(b), "similar act evidence is relevant only if the jury can reasonably conclude [by a preponderance of the evidence] that [1] the act occurred and that [2] the defendant was the actor."[25]

¶20 Although a number of sister states have adopted the clear and convincing evidence standard for introduction of prior bad

---

[24] 485 U.S. 681, 690 (1988).

[25] *Id.* at 689; *United States v. Beechum*, 582 F.2d 898, 912 (5th Cir. 1978) ("[A]n extrinsic offense [is] relevant to the issue of intent . . . only if [the] offense was in fact committed and the defendant in fact committed it.").

acts evidence, we decline to do so in Utah.[26] In *Huddleston*, the Supreme Court acknowledged the potential dangers posed by admitting evidence of uncharged misconduct.[27] But we agree with the Supreme Court that

> the protection against such unfair prejudice emanates not from a requirement of a preliminary finding by the trial court, but rather from four other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402—as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially

---

[26] There are valid reasons to adopt the clear and convincing standard, which is why a number of sister states have gone in that direction. *State v. Terrazas*, 944 P.2d 1194, 1198 (Ariz. 1997) (collecting cases) ("We believe there are important reasons to apply a clear and convincing standard, rather than some lesser standard, to evidence of prior bad acts. Such evidence is quite capable of having an impact beyond its relevance to the crime charged and may influence the jury's decision on issues other than those on which it was received, despite cautionary instructions from the judge."); WIGMORE ON EVIDENCE, *supra* note 10, § 4.8 ("[T]he Supreme Court's decision in *Huddleston*, under which the court need only determine that there is 'evidence sufficient to support a finding' that the uncharged misconduct has taken place, has not had a pervasive influence on the states, as many continue to require a higher degree of proof . . . .").

Among these reasons are due process concerns and a heightened concern with respect to unfair prejudice. *Terrazas*, 944 P.2d at 1198 ("Applying the standard of 'clear and convincing evidence' establishes a clear, recognizable standard for courts and lawyers and is consistent with the due process owed under the federal and state constitutions. To allow a lesser standard in a criminal case is to open too large a possibility of prejudice. We have recently noted the potentially prejudicial effects of prior bad acts evidence and cautioned trial courts and counsel to exercise extreme care in its use, even where it is admissible." (internal quotation marks omitted)).

[27] *Huddleston*, 485 U.S. at 691.

> outweighed by its potential for unfair prejudice; and
> fourth, from Federal Rule of Evidence 105, which
> provides that the trial court shall, upon request,
> instruct the jury that the similar acts evidence is
> to be considered only for the proper purpose for
> which it was admitted.[28]

We believe that these four safeguards, together with our scrupulous examination requirement (*infra* ¶¶ 36–37), are sufficient to protect against unfair prejudice.[29]

¶21 We do find it important to clarify that this conditional relevance analysis differs in several important respects when the State seeks to establish battered child syndrome (BCS) to disprove claims that a child's prior injuries were accidental. BCS is a widely accepted medical description that indicates a pattern of abuse by a caretaker.[30] The State may properly admit evidence of BCS in child abuse and murder cases, though it is relevant *only* to establish that the child's prior injuries were *intentionally* inflicted,

---

[28] *Id.* at 691–92 (internal citations and footnote omitted).

[29] As noted by the Supreme Court, rule 105 provides an additional opportunity for the court, upon request, to limit the prejudicial effect of the evidence. We note, however, that the trial court is not required to give an instruction to the jury with respect to their duty under rule 104(b). *United States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir. 1989) ("Although *Huddleston* requires that admission of prior bad acts under Rule 404(b) always must be evaluated by the district judge under the conditional relevancy test of 104(b), the district judge is not required to instruct the jury that it must find by a preponderance of the evidence that the defendant committed the similar act."); *United States v. Sliker*, 751 F.2d 477, 500 (2d Cir. 1984) ("We understand the general rule to be that the judge is permitted but not required to deliver a specific instruction to the jury to consider particularly any preliminary question under Rule 104(b)."). This is because matters of conditional relevance, like any other finding of fact (including credibility determinations), fall within the jury's general duty to act as the finder of facts. And courts routinely "instruct[] the jury that they [are] judges of the facts." *Hudson*, 884 F.2d at 1021.

[30] *State v. Tanner*, 675 P.2d 539, 541–42 (Utah 1983), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997).

rather than the result of accident or mistake.[31] And the State is required to introduce such evidence through experts, rather than through lay testimony.[32]

¶22 The issue of conditional relevance is central in this setting—while the State must connect prior child abuse to a defendant by a preponderance of the evidence when doing so to establish identity,[33] it need not connect prior child abuse to a defendant if the prior abuse is being introduced solely to establish BCS in order to prove intent. This is because the State can prove that prior abuse was *intentional* without simultaneously being required to establish *identity*.[34] In *Estelle v. McGuire*, the United States Supreme Court made this clear in overturning a court of appeals' decision on this very point—"whether [the prior abuse] was directly linked to [the defendant] or not, [it] was probative on the question of the intent with which the person who caused the injuries acted."[35] Though evidence of BCS will by its very nature limit the possible perpetrators to the child's caretakers,[36] it does

---

[31] *Estelle v. McGuire*, 502 U.S. 62, 69 (1991) ("Proof of [the victim's] battered child status helped to [establish intent]; although not linked by any direct evidence to [the defendant], the evidence demonstrated that [the victim's] death was the result of an intentional act by *someone,* and not an accident.").

[32] *Tanner*, 675 P.2d at 542 ("The diagnosis is dependent on inferences, not a matter of common knowledge, but within the area of expertise of physicians whose familiarity with numerous instances of injuries accidentally caused qualifies them to express with reasonable probability that a particular injury or group of injuries to a child is not accidental or is not consistent with the explanation offered therefor but is instead the result of physical abuse by a person of mature strength." (internal quotation marks omitted)).

[33] *Supra* ¶ 19.

[34] *Estelle*, 502 U.S. at 68 ("When offered to show that certain injuries are a product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries." (discussing BCS under California law)).

[35] *Id*. at 69.

[36] *Id.* at 74 ("The proof of battered child syndrome itself narrowed the group of possible perpetrators to [the defendant]
(continued)

not bear directly on the issue of identity, which is a separate element of the crime that must then be proven independently.

¶23 In sum, although it is true that "[o]ur child abuse case law clearly indicates that evidence of instances of uncharged abuse involving the same victim and the same defendant is admissible for proper noncharacter purposes,"[37] it can be admitted only under specific conditions. If the State decides to establish BCS, it may do so *only* to establish intent (or lack of accident/mistake), and it may be introduced *only* through expert testimony. If it were otherwise, the State could use BCS to sidestep the important requirement of Utah Rule of Evidence 104 that a reasonable jury must be able to connect the prior act to the defendant by a preponderance of the evidence for the court to rule favorably on its admission. If the judge determines that there is not "evidence sufficient to support a finding"[38] that the defendant committed the prior abuse, then the evidence must be excluded as irrelevant.

¶24 In the present case, Ms. Lucero first argues that the trial court erred in admitting evidence of Alex's prior injury under our BCS framework. We agree. During argument on the State's motion in limine to admit evidence of Alex's prior injury, the State discussed the aforementioned case of *Estelle v. McGuire* and argued that "it's not essential under 404(b) for the government to connect the prior episode or the prior evidence to any particular perpetrator in order for it to be relevant in a child abuse setting." The State then went on to argue, erroneously, that such evidence is admissible "not as evidence of a prior crime, but as evidence of who it was that actually inflicted the final fatal injuries upon the child" and as evidence of "lack of accident or mistake." After hearing argument from both parties, the judge instructed the parties that it needed time to consider "whether or not there has

---

and his wife, because they were the only two people regularly caring for [the victim] during her short life.").

[37] *State v. Killpack*, 2008 UT 49, ¶ 46, 191 P.3d 17; *see also State v. Teuscher*, 883 P.2d 922, 927 (Utah Ct. App. 1994) ("Evidence regarding prior instances of abuse perpetrated against the victim is clearly admissible in Utah to show identity, intent or mental state, and lack of accident or mistake."), *abrogated on other grounds by State v. Levin*, 2006 UT 50, 144 P.3d 1096.

[38] UTAH R. EVID. 104(b) (2009).

to be more of a connection between the act . . . that the State intends to bring in and Ms. Lucero." The judge also specifically noted that she would review *Estelle*, but indicated that "if I am convinced, after reading that case and any others when we shepardize that case that it supports the State's position, I just wanted to give you heads up, that I'll allow it."

¶25 The court later granted the motion, and in a final argument before trial stated that it was admitting the evidence under rule 404(b) for the purpose of showing "identity, intent or mental state, lack of mistake, and opportunity." The judge also noted that she had reviewed *Estelle* and Utah's BCS caselaw, including *State v. Tanner*[39] and *State v. Fedorowicz*,[40] which both discuss BCS. In its ruling, however, the court conflated the proper 104(b) and BCS analyses, stating that these cases "talk[] about [the] evidence in terms of [BCS]" and that

> those cases seem to indicate that the State does not have to prove conclusively that the defendant was the person that perpetrated a prior bad act. That if the prior bad act is relevant under one of the 404(b) articulated purposes, that it may be admitted and it is based then on the reading of those cases that I find that it is appropriate to grant the State's motion in regards to this evidence.

Although it is true that prior abuse need not be linked "conclusively" to a defendant to admit such evidence, mere relevance "under one of the 404(b) articulated purposes" is not enough—even if the State is seeking its admission only to establish BCS. As discussed above, rule 104(b) requires a preponderance threshold in connecting the act to the defendant, and our BCS framework requires specific expert testimony regarding BCS. Here, the court neither applied the correct rule 104(b) framework, nor did it require the State to limit the evidence to establishing BCS through an expert. Instead, the evidence came in as relevant for a host of purposes without the judge requiring that the evidence be properly connected to Ms. Lucero.

¶26 Although we agree with Ms. Lucero that the court misapplied our BCS framework in admitting evidence of Alex's prior injury, we hold that such error was harmless. Our harmless

---

[39] 675 P.2d 539 (Utah 1983).

[40] 2002 UT 67, 52 P.3d 1194.

error analysis under rule 104(b) mirrors our analysis under rule 404(b)—that is, a trial court's failure to properly conduct a 104(b) analysis is harmless if the evidence "would have been admitted had the trial court undertaken the proper review."[41] Here, the trial court properly determined that the evidence was relevant under rule 402. The identity of the attacker here was not only important to the State's case—determining the identity of Alex's killer was the *central contested issue* at trial. And since there were no witnesses to Alex's death other than Mr. Martinez and Ms. Lucero (who blame each other), the State's use of the evidence of prior abuse made the State's argument—that Ms. Lucero killed Alex—more probable.

¶27  But it is apparent from the record that the court failed to properly review the evidence under rule 104. The court made no mention of rule 104 in its discussion, though it did struggle with the issue of whether there was a sufficient "connection between the act . . . that the State intends to bring in and Ms. Lucero." Still, we conclude that there was sufficient evidence that a jury could reasonably connect Ms. Lucero to the prior abuse (the "condition of fact") by a preponderance of the evidence. First, the State put on testimony from several witnesses, including Ms. Lucero herself, that she and her mother were the only ones with access to Alex during the time of his prior injury. She also told numerous individuals that she personally took Alex out of the room when his fatal injury occurred. She maintained this story during her interrogation until she began to shift the blame for Alex's death to Mr. Martinez.

¶28 Second, the State put on evidence that Mr. Martinez never spent time alone with Alex and that Ms. Lucero had specifically instructed Mr. Martinez to keep his distance from Alex and not to discipline him. Third, although Ms. Lucero claims that Mr. Martinez could have caused the prior injury during a fishing trip with Alex, the injury did not manifest itself until days

---

[41] *State v. High*, 2012 UT App 180, ¶ 41, 282 P.3d 1046 ("Put simply, if a scrupulous examination would have resulted in the evidence being admitted, the trial court's failure to conduct that examination has not harmed the defendant. In the alternative, we may assume that a scrupulous examination would have resulted in the exclusion of the evidence but that there is no reasonable likelihood that the assumed error affected the outcome.").

after the fishing trip, at a time during which Mr. Martinez had not interacted with Alex. And Ms. Lucero was present with Alex during the fishing trip and presented no evidence that Mr. Martinez harmed Alex on that occasion either. Finally, we also note that Ms. Lucero used the evidence of the prior abuse to support her own case—that it was Mr. Martinez that inflicted both the prior abuse and the fatal injury.

¶29  Because Ms. Lucero also used the evidence of prior abuse to support her own case, and because her later accounts conflicted with her early interrogation testimony and statements to first responders, the question of credibility lay ultimately with the jury. But given the above, we conclude that there was at least a preponderance of the evidence both that the prior injury occurred and that Ms. Lucero caused it. Accordingly, we hold that the court's error was harmless—the evidence would still have been admitted had the trial court undertaken a proper review of the evidence under rule 104.

*C. The Trial Court Properly Determined that the Probative Value of the Evidence of Prior Abuse was not Substantially Outweighed by the Danger of Unfair Prejudice*

¶30  Ms. Lucero's third contention is that the probative value of the evidence of prior abuse is far outweighed by its prejudicial effect. Rule 403, which is the final hurdle that prior bad acts evidence must overcome, provides that

> [a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Under this rule, the trial court is called on to weigh the evidence, because even highly relevant evidence may sustain both proper and improper inferences. This "preserve[s] the integrity of rule 404(b)" and prevents routine admission of improper propensity inferences whenever a "plausible companion inference" is suggested.[42]

¶31  In weighing the evidence under rule 403, the court may consider a number of factors, including those we identified in *State v. Shickles*:

---

[42] *Verde*, 2012 UT 60, ¶ 18.

the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.[43]

¶32 Since our decision in *Shickles*, a number of courts have relied heavily on this list of factors in weighing evidence under rule 403.[44] But while some of these factors may be helpful in assessing the probative value of the evidence in one context, they may not be helpful in another. It is therefore unnecessary for courts to evaluate each and every factor and balance them together in making their assessment. This is because courts are bound by the text of rule 403, not the limited list of considerations outlined in *Shickles*. In fact, we stated in *Shickles* that these were "suggest[ed]" factors drawn from the treatise McCormick on Evidence.[45] Simply put, a trial court may exclude evidence if "its probative value is substantially outweighed by" a number of considerations, including "the danger of unfair prejudice."[46] Of importance here is that the probative value of the evidence must be "*substantially* outweighed by the danger of *unfair* prejudice";[47] and unfair prejudice results only where the evidence has an "undue tendency to suggest decision upon an improper basis."[48] Given this bar, we "indulge a presumption in favor of admissibility."[49]

¶33 Here, the court properly concluded that the probative value of the evidence of prior abuse was not substantially outweighed by the danger of unfair prejudice. In conducting its

---

[43] 760 P.2d 291, 295–96 (Utah 1988), *abrogated on other grounds by Doporto*, 935 P.2d at 489.

[44] *See Nelson-Waggoner*, 2000 UT 59, ¶¶ 28–30; *High*, 2012 UT App 180, ¶¶ 29–31, 39.

[45] *Shickles*, 760 P.2d at 295–96.

[46] UTAH R. EVID. 403 (2009).

[47] *Id.* (emphases added).

[48] *State v. Bair*, 2012 UT App 106, ¶ 22, 275 P.3d 1050 (internal quotation marks omitted).

[49] *State v. Dunn*, 850 P.2d 1201, 1221–22 (Utah 1993).

analysis, the court identified the *Shickles* factors and analyzed the evidence in light of them. In particular, the court concluded that both acts were highly similar. Both involved the same victim, a similar mechanism, and both caused injuries within inches of each other. Furthermore, the court highlighted the fact that the interval of time between the two acts was extremely short—less than a week separated the two injuries. Finally, the court concluded that the evidence would not arouse the jury to overmastering hostility. Any risk here was slight because the prior injury was tame in comparison to the fatal injury.

¶34 By contrast, Ms. Lucero's counsel highlighted the weakness of the evidence, pointing to the magistrate judge's determination at a preliminary hearing that the State lacked probable cause to bind Ms. Lucero over on the prior child abuse charge. But probable cause determinations at these preliminary hearings are given only limited deference on appeal.[50] And these determinations do not prevent trial courts from admitting evidence of the prior acts under Utah Rule of Evidence 104 or, alternatively, our BCS framework.[51] In fact, it is particularly important that the State be permitted to introduce evidence of prior *uncharged* instances of child abuse, regardless of a bindover decision, since this is often the only way to "complete[] the story of the *charged* abuse."[52]

¶35 Here, the probative value of the evidence was great given the similarity and short interval of time between the instances of abuse, as well as the central importance of the evidence in helping the jury determine identity. The danger of unfair prejudice was also quite low because the prior injury was tame in comparison to the fatal one—this meant there was a very low risk of overmastering hostility by the jury. Additionally, the evidence linking Ms. Lucero to the prior abuse was sufficiently strong, as discussed above.[53] The State presented evidence that Ms. Lucero was Alex's primary caretaker and that she was the only one present both when the prior injury surfaced and when the fatal

---

[50] *State v. Virgin*, 2006 UT 29, ¶ 26, 137 P.3d 787 ("[I]n reviewing a magistrate's bindover decision, an appellate court should afford the decision limited deference.").

[51] *Supra* ¶¶ 18–23.

[52] *Killpack*, 2008 UT 49, ¶ 46 (emphasis added).

[53] *Supra* ¶¶ 24–29.

injury occurred. Given the above, we conclude that the trial court was correct in ruling that the probative value of the prior acts evidence was not substantially outweighed by the danger of unfair prejudice.

*D. The Trial Court Scrupulously Examined the Evidence*

¶36 Ms. Lucero's final claim with respect to the admission of evidence of the prior injury is that the trial court failed to scrupulously examine the evidence. As discussed below, the trial court met the scrupulous examination requirement when it engaged in a full analysis, on the record, of the requirements for admission of prior bad acts evidence. In reviewing prior bad acts for admissibility under each of the aforementioned rules, the evidence supporting admission must be "scrupulously examined."[54] In *Verde*, we made this requirement plain in the context of rule 404(b)—the judge must use "care and precision"[55] in evaluating "the true—and predominant—purpose"[56] for admission. This same level of care is required for all questions of admissibility of evidence of prior bad acts, and particularly when an issue of conditional relevance arises under rule 104(b). This helps safeguard against any effort by a party to introduce evidence as "merely a ruse."[57]

¶37 We acknowledge that our case law giving effect to the "scrupulous examination" requirement has, to date, been somewhat unclear. In giving substance to the requirement, we have instructed trial courts to engage in a three-part analysis under rules 404(b), 402, and 403, and that the court's job is to engage in the "dotting of 'i's and crossing of 't's.'"[58] Procedurally, in some cases we have held that evaluating the proposed evidence on the record is sufficient.[59] In others, we held that briefing and

---

[54] *Verde*, 2012 UT 60, ¶ 13 (internal quotation marks omitted).

[55] *Id.* ¶ 55.

[56] *Id.* ¶ 22.

[57] *Id.*

[58] *Decorso*, 1999 UT 57, ¶ 18 n.2 (internal quotation marks omitted).

[59] *See Nelson-Waggoner*, 2000 UT 59, ¶¶ 3, 23 (noting that scrupulous examination requirement met where trial court thoroughly evaluated proposed evidence).

oral argument were sufficient.[60] Recently, in *State v. Ferguson*, the court of appeals concluded that a trial court abused its discretion by failing to engage in the three-part analysis on the record.[61] We now clarify that the scrupulous examination requirement is met when the trial court engages in this three- or four-step analysis[62] on the record. This is essential for effective appellate review of the issues.[63] As to rule 403 analysis specifically, we add that "[t]he court need not identify each of the *Shickles* factors in its analysis as long as we can discern that it made a sufficient inquiry under rule 403."[64] And when matters of conditional relevance are raised under rule 104, as the Supreme Court explained in *Huddleston*, the judge must consider the totality of the evidence—"[i]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts."[65]

---

[60] *State v. Widdison*, 2001 UT 60, ¶ 44, 28 P.3d 1278 (scrupulous examination met where the "parties extensively briefed and argued the issue"); *see also State v. Burke,* 2011 UT App 168, ¶ 27 n.10, 256 P.3d 1102 (although "the trial court simply ruled from the bench . . . and did not enter any specific findings or conclusions[,] . . . based on the evidence and argument before the trial court on this issue, it can be inferred that the trial court 'scrupulously examined' the relevant evidence"); *State v. Bradley*, 2002 UT App 348, ¶ 38, 57 P.3d 1139 (trial court scrupulously examined evidence when it "conducted a pre-trial hearing that addressed the rule 404(b) evidence" and "[b]oth sides submitted briefs addressing the issue . . . and there was a great deal of discussion concerning the admission" of the testimony).

[61] 2011 UT App 77, ¶ 18, 250 P.3d 89.

[62] The analysis becomes four part when a party raises an issue of conditional relevance under rule 104(b), *supra* ¶¶ 18–20.

[63] *See State v. Smith*, 725 P.2d 951, 953 (Wash. 1986) (en banc) ("[A] trial court errs if the judge does not undergo the aforesaid analysis *on the record*. Failure to do so precludes the trial court's thoughtful consideration of the issue, and frustrates effective appellate review." (internal quotation marks omitted)).

[64] *State v. Harter*, 2007 UT App 5, ¶ 30, 155 P.3d 116.

[65] *Huddleston*, 485 U.S. at 691 (alteration in original) (internal quotation marks omitted).

¶38 As an initial matter, we hold that Ms. Lucero properly preserved her scrupulous examination argument for appeal by opposing introduction of the prior acts evidence at trial. And before us, she argues that "the court did not engage in a specific analysis of the facts of the prior incident or their relation to this case." But a detailed recitation of the facts, as suggested by Ms. Lucero, is not required of the court. The record demonstrates that the trial judge went through each of the three steps required in a 404(b) analysis. The judge noted that many of the *Shickles* factors weighed in favor of admission, particularly the similarity of the injuries and the closeness in time of the two injuries. As to the question of conditional relevance, the trial court made particular effort to thoroughly evaluate the facts and underlying law. After an initial hearing, the court stated that it needed additional time to consider the conditional relevance question. It took the matter under advisement, reviewed additional case law, and then made its decision on the record before trial commenced. In fact, the court mentioned its desire to "put specifics of the ruling on the record."

¶39 The court also received sufficient briefing and argument. First, the State filed a motion and a memorandum in support of admitting the evidence under rule 404(b). The court heard additional arguments at the motion hearing, in which defense counsel opposed the admission of the evidence orally, raising many potential issues with the evidence under rule 404(b). Furthermore, although Ms. Lucero did not respond in writing to the State's rule 404(b) motion, she had briefed the court on rule 404(b) in a previous motion to admit testimony of Mr. Martinez's prior assault. The trial court here did far more than simply allow the evidence without any discussion, as in *Ferguson*.[66] Ms. Lucero also argues that the trial court failed to scrupulously examine the evidence that allegedly failed to connect Ms. Lucero to the prior abuse. Though we agree that the trial court could have done more to analyze the evidence of this matter on the record, the State's brief detailed the evidence it would present at trial that connected Ms. Lucero specifically to the prior abuse. Because the trial court received more than sufficient briefing and analyzed each of the particular issues on the record in its ruling, we conclude that the trial court scrupulously examined the evidence.

---

[66] 2011 UT App 77, ¶ 17.

¶40 Having concluded that the trial court scrupulously examined the evidence and did not abuse its discretion in admitting evidence of prior abuse under rules 404(b), 402, 104(b), and 403, we now turn to Ms. Lucero's ineffective assistance of counsel claims.

## II. DEFENSE COUNSEL'S PERFORMANCE WAS NOT DEFICIENT

¶41 In her second claim, Ms. Lucero argues that defense counsel was ineffective in three ways: (1) he stipulated that another one of Ms. Lucero's children had been hospitalized for unexplained seizures; (2) he did not object to the admission of Ms. Lucero's unredacted interrogation video into evidence at trial; and (3) he failed to present BWS expert testimony at trial. After examining Ms. Lucero's arguments, we conclude that there was a conceivable tactical basis for defense counsel's strategies, and therefore his performance was not deficient. After denying her ineffective assistance of counsel claims, we then reach the pending rule 23B motion that was granted by the court of appeals. Although supplementation under rule 23B may bring to light evidence that counsel could have employed an *alternative* reasonable strategy, such evidence would not sway our decision here that the strategy actually employed was, *itself*, reasonable—which is all that is required of counsel under *Strickland v. Washington*.[67] Accordingly, we revisit the court of appeals' Order and vacate the Order on grounds of mootness.

¶42 "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law" that we review for correctness.[68] But review of defense counsel's performance "must be highly deferential; otherwise, the distorting effects of hindsight would produce too great a temptation for courts to second-guess trial counsel's performance on the basis of an inanimate record."[69] In proving that counsel performed ineffectively, a defendant must show "(1) that counsel's performance was objectively deficient, and (2) a reasonable probability exists that but for the deficient

---

[67] 466 U.S. 668 (1984).

[68] *State v. Charles*, 2011 UT App 291, ¶ 18, 263 P.3d 469.

[69] *State v. Tennyson*, 850 P.2d 461, 466 (Utah Ct. App. 1993) (internal quotation marks omitted).

conduct the defendant would have obtained a more favorable outcome at trial."[70]

¶43 To satisfy the first prong of this test, Ms. Lucero must overcome the "strong presumption that her trial counsel rendered adequate assistance"[71] by persuading the court that there was no "*conceivable tactical basis* for counsel's actions."[72] The court "give[s] trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them."[73] "Put another way, [i]f a rational basis for counsel's performance can be articulated, [the court] will assume counsel acted competently,"[74] even if another, possibly more reasonable or effective strategy could have been employed. The second prong of the test requires Ms. Lucero "to show that the error was harmful."[75] This "prejudice analysis is the same under both a plain error and ineffective assistance of counsel framework."[76] Because we conclude that counsel's performance was not deficient, we need not reach Ms. Lucero's prejudice arguments.

*A. Defense Counsel's Performance Was not Deficient When He Stipulated that Another of Ms. Lucero's Children Suffered from a Seizure Disorder*

¶44 Ms. Lucero first contends that her trial counsel's performance was ineffective because he stipulated that I.H., one of Ms. Lucero's twin boys, had been hospitalized after suffering

---

[70] *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162; *see Strickland*, 466 U.S. at 687.

[71] *State v. Crosby*, 927 P.2d 638, 644 (Utah 1996).

[72] *State v. Bryant*, 965 P.2d 539, 542 (Utah Ct. App. 1998) (emphasis added) (internal quotation marks omitted); *see Strickland*, 466 U.S. at 689 (indicating that counsel should be given wide latitude in making tactical decisions).

[73] *Crosby*, 927 P.2d at 644.

[74] *Bryant*, 965 P.2d at 542–43 (alterations in original) (internal quotation marks omitted).

[75] *State v. Jimenez*, 2012 UT 41, ¶ 15, 284 P.3d 640.

[76] *State v. Munguia*, 2011 UT 5, ¶ 13, 253 P.3d 1082 (internal quotation marks omitted).

from a seizure disorder and that the cause of these seizures was unknown. The stipulation read, in part:

> [O]n July 29, 2008, the defendant, Adrianna Lucero, while home alone with [I.H.] . . . noticed that [I.H.] seemed to be twitching, crying softly and/or whining. He repetitively extended his arms, his eyes stared straight ahead and he was unresponsive to verbal or tactile stimulation.
>
> Adrianna called her mother, Geraldine Rodriguez, who came home to help. [They] took [I.H.] to Pioneer Valley Hospital and he was transferred to Primary Children's Medical Center. [I.H.] continues to have seizures but the doctors treating him have been unable to determine the cause of the seizures despite extensive testing. No affirmative signs of non-accidental trauma have been identified by the doctors as the cause of seizures.

The court read this stipulation to the jury just before the interrogation video was played.

¶45 Ms. Lucero claims that allowing this stipulation to be read to the jury constituted deficient performance. She first contends that the evidence would have been deemed inadmissible and then argues that stipulating to its presentation left the jury to speculate that Ms. Lucero caused I.H.'s injuries and therefore also caused Alex's fatal injury. Ms. Lucero ultimately claims that there was no reasonable basis for "giving this information to the jury in light of its highly prejudicial nature," and that "[t]he defense could have been conducted without ever mentioning [I.H.]'s hospitalization." The State proposes three reasonable defense strategies that suggest that there was indeed a "conceivable tactical basis for counsel's actions."[77] We agree that any one of the three, discussed below, was a reasonable tactical basis for asking for the stipulation and conclude that counsel's stipulation did not constitute deficient performance.

¶46 The State first suggests that defense counsel may have asked for the stipulation because it would explain why Ms. Lucero lied to protect Mr. Martinez. If the jury were presented with information about I.H.'s seizures, it would help them understand why Ms. Lucero may have originally thought that

---

[77] *Bryant,* 965 P.2d at 542 (internal quotation marks omitted).

Alex was also experiencing a similar, naturally caused seizure. Accordingly, Ms. Lucero may well have thought that lying to investigators could have shielded Mr. Martinez from questioning, and that she could do so without fear of incrimination because the seizure was not caused by abuse. This is a plausible tactical decision for defense counsel to make because undoubtedly the defense was trying to find a way to reconcile Ms. Lucero's contradictory stories. While at first Ms. Lucero told officials that she had taken Alex out of the room to get Jell-O when he sustained the fatal injury (purportedly to protect Mr. Martinez), she later changed her story and claimed, instead, that Mr. Martinez had taken Alex out of the room. Providing this contextual information to the jury supported Ms. Lucero's theory of why she initially lied to investigators.

¶47 Second, the State suggests that the stipulation cut against the officer's insinuations in the video that Ms. Lucero had harmed I.H. and helped explain that the officer's insinuations were unsupported by evidence. In the interrogation video, the officer on several occasions insinuated that, given Ms. Lucero's claim that Alex suffered a seizure, he was unsure whether I.H.'s seizures were caused by similar abuse. The stipulated statement dispelled these insinuations by making clear that despite "extensive testing," there were "no affirmative signs of non-accidental trauma" that may have caused I.H.'s seizures. And given the importance of the overall video and the officer's forceful questioning to the defense's theory of the case, *infra* ¶¶ 50–51, it is conceivable that the stipulation would highlight the fact that the interrogating detective was needlessly hostile and that his accusations were baseless.

¶48 Third, and last, the State suggests that the stipulation portrayed Ms. Lucero "as an attentive and caring mother because she took her child to the hospital." Because of other evidence that Ms. Lucero was occasionally aggressive and violent, it is reasonable that defense counsel would seek to counteract this evidence in any way possible. And the stipulation supported this goal—it explained that she called on her mother for help and that they brought I.H. to the hospital for treatment. By informing the jury that she sought help from medical professionals in this manner, it helped show that she was concerned for her children's well-being. Together with Ms. Lucero's own statements in the video of how she cared for her children, requesting the stipulation was clearly a reasonable trial strategy for counsel to have adopted.

¶49 In response to the State's proposed defense strategies, Ms. Lucero argues that even if the stipulated statement were conceivably introduced for any of those reasons, none would justify admitting this "highly prejudicial evidence" to make a "minor point." But as the Supreme Court stated in *Strickland*,

> [j]udicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.[78]

In "reconstruct[ing] the circumstances of counsel's challenged conduct," it is conceivable that counsel agreed to the stipulation to explain her previous lie, to counteract other negative insinuations in the video, and to portray Ms. Lucero as a caring mother. Ms. Lucero's argument concerning deficient performance thus fails to overcome the "strong presumption"[79] that her defense counsel's performance at trial was not deficient. The State's three plausible strategies are sufficient to justify counsel's performance.

*B. Defense Counsel was not Deficient in Agreeing to Show the Largely Unredacted Police Interview at Trial*

¶50 Ms. Lucero's second ineffective assistance argument is that defense counsel performed deficiently by agreeing to show the unredacted interrogation video to the jury, and that there was no reasonable tactical basis for doing so. Ms. Lucero claims that showing the video to the jury, together with later questioning at trial, allowed the State to insinuate and the jury to conclude that she was the cause of I.H.'s seizures and Alex's death because Ms. Lucero had been alone with I.H. when he started having seizures. The video contained Ms. Lucero's largely unredacted interrogation by Detective Adamson, who suggested that Ms. Lucero committed the homicide because she also abused Alex the week before and had abused I.H. and caused his seizures.

---

[78] *Strickland*, 466 U.S. at 689.

[79] *Crosby*, 927 P.2d at 644.

Based on the prejudicial nature of the interrogation video and its lack of relevance, Ms. Lucero argues, defense counsel performed deficiently in stipulating to its admission.

¶51 The State responds to Ms. Lucero's argument by suggesting that the interrogation video, in its entirety, supported the defense's argument that Ms. Lucero "stuck to her story despite 'immense pressure' from police to confess." Part of defense counsel's argument was that Ms. Lucero was harshly interrogated for two hours and forty minutes, "yet she did not break." It is conceivable that defense counsel made a tactical decision to show the jury the entire video because, after having the stipulation read to the jury that served to discredit the detective's accusations that Ms. Lucero hurt I.H., the video might hurt the officer's credibility while strengthening the defense's theory. In her Reply, Ms. Lucero argues that defense counsel was only required to disprove the detective's insinuations because he sought the stipulation in the first place. But it is conceivable that playing the video in its entirety was necessary to best demonstrate to the jury what kind of pressure Ms. Lucero was under from authorities and how she nonetheless remained steadfast in proclaiming her innocence. The jury may well have been sympathetic to Ms. Lucero after viewing her emotional reactions, including a prayer, in response to the officer's forceful accusations. Because of these very conceivable tactical bases, we conclude that defense counsel's performance was not deficient.

*C. Defense Counsel's Decision not to Introduce Expert Testimony Regarding Battered Woman's Syndrome Did not Constitute Deficient Performance*

¶52 Ms. Lucero's final ineffective assistance claim is that counsel failed to both investigate and present expert testimony regarding BWS. She asks the court to find that counsel was ineffective or, in the alternative, to lift the stay on the court of appeals' 23B Order so that she can supplement the record to better establish ineffective assistance. We conclude that Ms. Lucero's counsel did not perform deficiently, since adopting the deportation theory of the case was a reasonable trial strategy. Furthermore, given the violent instances from Ms. Lucero's past that the State would have highlighted in responding to a BWS defense, we cannot conclude that it was unreasonable not to pursue this alternative strategy. Supplementation on remand is therefore unnecessary because it would not alter our conclusion. Having so concluded, we vacate the Order granting Ms. Lucero's rule 23B motion as moot.

1. Ineffective Assistance of Counsel

¶53 First, Ms. Lucero claims that counsel performed deficiently because if he had presented BWS expert testimony, it would have explained not only why she initially lied about taking Alex to the other room, but also why she stayed with Mr. Martinez if he were abusive. Ms. Lucero's brief is replete with cases from various jurisdictions demonstrating that BWS testimony is commonly presented at trial and is beneficial to juries in helping to explain the unusual behavior of battered victims. We agree that adopting a BWS theory to explain Ms. Lucero's actions may have been reasonable but counsel's decision to choose one of two alternative, reasonable trial strategies is not grounds for an ineffective assistance of counsel ruling.

¶54 At trial, counsel could have adopted one of several theories to explain Ms. Lucero's contradictory stories: First, counsel could have claimed BWS and presented evidence and expert testimony accordingly. Second, counsel could have emphasized that Ms. Lucero was concerned that Mr. Martinez, the father of her twins, would be deported. Or third, counsel could have adopted both theories and argued BWS in addition to her fear that Mr. Martinez would be deported. At oral argument, counsel argued that defense counsel was ineffective for the latter—failing to offer both theories as alternative explanations for Ms. Lucero's contradictory stories. But *Strickland* does not require counsel to argue *every* reasonable theory—the standard requires only that the theory ultimately employed, itself, be reasonable.

¶55 Here, we conclude that it was a reasonable trial strategy for counsel to present, exclusively, the deportation theory. At trial, counsel put on evidence of the deportation of Alex's father, as well as Ms. Lucero's concern over Mr. Martinez's potential deportation. We agree, as the State suggests, that adopting the deportation theory was a reasonable strategy because it helped tie Ms. Lucero's testimony, the interrogation, and the zoo incident into a consistent narrative. Since Ms. Lucero expressed concern over Mr. Martinez's deportation in each of these instances, it was an effective basis for counsel to use to explain Ms. Lucero's behavior.

¶56 Ms. Lucero contends, however, that counsel was ineffective because he failed to *also* present BWS expert testimony—that "[t]here was no reasonable tactic for not presenting this expert testimony since it would have aided the jury in understanding something beyond their knowledge, it would have helped them understand why [Ms. Lucero] covered

for Mr. Martinez and stayed with him despite the abuse, and would have enhanced her credibility."

¶57 We disagree. A BWS strategy would not necessarily have been an effective tactic, since the State could have undercut a BWS claim with violent instances from Ms. Lucero's past, including breaking a phone, computer screen, and windshield in response to frustration over Mr. Martinez and his family in Mexico. This could have undermined the defense's presentation of Ms. Lucero as a loving, attentive mother and may have led the jury to view Ms. Lucero as a violent individual who was capable of harming Alex. Given the above, we conclude that defense counsel's performance was not deficient.

2. Rule 23B Order

¶58 In addition to Ms. Lucero's argument that counsel was ineffective for failing to present expert BWS testimony at trial, Ms. Lucero also argues that counsel failed to properly investigate BWS. The court of appeals granted Ms. Lucero's previous rule 23B motion to supplement the record on this point, but the parties stipulated to stay the remand after we recalled the case. Because we have already concluded that it was reasonable for defense counsel to adopt the deportation theory to explain Ms. Lucero's contradictory stories, and because a BWS theory may very well have undercut Ms. Lucero's case given violent instances from her past, supplementation is unnecessary. It would only serve to establish the strength of BWS cases generally, and we have already noted as to this case specifically that it was not unreasonable to pursue an alternative strategy.

¶59 Accordingly, we revisit the court of appeals' Order to remand and vacate the Order, since supplementation of the record would not alter our ultimate conclusion. Any further evidence or argument on this point would be moot.[80]

¶60 In sum, we hold that defense counsel's performance was not deficient, including his decision to use the stipulated statement, play the largely unredacted interrogation video, and adopt exclusively the deportation theory to explain Ms. Lucero's

---

[80] *Navajo Nation v. Utah (In re L.O.)*, 2012 UT 23, ¶ 8, 282 P.3d 977 ("An appeal is moot if during the pendency of the appeal circumstances change so that the controversy is eliminated, thereby rendering the relief requested impossible or of no legal effect." (internal quotation marks omitted)).

inconsistent statements. We therefore revisit the rule 23B Order and vacate the Order on grounds of mootness.

### III. CUMULATIVE ERROR

¶61  Finally, Ms. Lucero claims that all of the aforementioned errors constitute cumulative error. "The cumulative error doctrine requires reversal only if the cumulative effect of . . . several errors undermines our confidence . . . that a fair trial was had."[81] Having disposed of Ms. Lucero's evidentiary claims, as well as her ineffective assistance of counsel arguments, we cannot so conclude. Additionally, since Ms. Lucero has "failed to establish any errors of counsel that prejudiced [her] right to a fair trial, the doctrine of cumulative error does not apply."[82]

### CONCLUSION

¶62  We affirm Ms. Lucero's convictions for child abuse and homicide, holding that the trial court did not err in admitting evidence of prior child abuse under rule 404(b). We also hold that defense counsel's performance was not deficient and therefore deny Ms. Lucero's ineffective assistance of counsel claims. Given the above, we also conclude that there was no cumulative error.

––––––––––––

[81] *State v. Hamilton*, 2003 UT 22, ¶ 56, 70 P.3d 111 (alterations in original) (internal quotation marks omitted).

[82] *Archuleta v. Galetka*, 2011 UT 73, ¶ 146, 267 P.3d 232 (internal quotation marks omitted).