**2016 UT App 223**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KEN MONTEY JOHNSON,
Appellant.

Opinion
No. 20141155-CA
Filed November 10, 2016

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
No. 141907022

Alexandra S. McCallum, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN
concurred.

CHRISTIANSEN, Judge:

¶1　Defendant Ken Montey Johnson appeals his convictions
for burglary, damage to/interruption of a communication device,
and theft.[1] He contends that the district court's instructions to
the jury were inadequate and misleading, that prejudicial

---

1. Defendant's opening brief appeals from these three
convictions. However, the same brief also notes that he pled
guilty to the latter two charges. He did not, and does not seek to,
withdraw his guilty pleas. As a result, and because his brief
focuses on the burglary conviction, we review only that
conviction.

portions of a voicemail recording were improperly admitted into evidence, that the judge and bailiff had improper contact with the jury, and that hearsay evidence was improperly admitted at trial. We affirm.

BACKGROUND

¶2     "On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly." *State v. Dozah*, 2016 UT App 13, ¶ 2, 368 P.3d 863. "We include conflicting evidence as relevant and necessary to understand the issues on appeal." *Id.*

¶3     Victim and Defendant divorced in 2010. Victim was awarded the marital residence, but was required to pay Defendant $25,000. Victim initially executed a promissory note in favor of Defendant for the full amount, but Defendant later agreed to a reduced note of $15,000 due to Victim's financial situation. Nevertheless, by the spring of 2014, Victim had yet to make any payment on the note and the debt had become a point of dispute between them.

¶4     On March 30, 2014, Defendant called Victim and left a voicemail stating that he was coming over to talk about the money. Victim claimed that, in the voicemail, Defendant "sounded extremely drunk" and was "slurring his words." When he arrived at her house and started kicking at the back door, Victim threatened to call the police. While she dialed 911 on her cell phone, Defendant broke open the back door and entered the house. Victim accidentally hung up while Defendant was "screaming and yelling" because she was scared and "shaking like crazy." When the 911 operator returned the call, Defendant "grabbed" the phone, feigned punches toward Victim, and continued to yell in slurred words that he wanted to talk to Victim. Victim attempted to retrieve the phone but Defendant grabbed her wrist, saying, "I should throw you down

the stairs right now." Eventually Victim retreated, and Defendant fled the house with the phone and later destroyed it.

¶5     At trial, the central issue was whether Defendant had entered or remained in the house with the intent to commit theft or assault. Defendant argued that he lacked the intent to commit a theft because he did not enter or remain in the house with the intent to permanently deprive Victim of her phone. In support of this claim, Defendant presented his own testimony that he had taken the phone only to "keep her from calling the police" and that he did not intend to assault Victim or steal her phone while he entered and remained in the house. Defendant also presented testimony from his friend that he went to the friend's residence after fleeing from Victim's house and had expressed a desire to "get back" to Victim's house to "give the phone back" to her. According to Defendant, he had no intent to destroy the phone until he returned to Victim's house and saw that the police had arrived whereupon he smashed the phone, "'cause I was mad the police were there."

¶6     During the trial, the State sought to enter into evidence a recording of a voicemail Defendant left on Victim's phone about a week after the incident. The garbled but obscenity-laden recording was almost four minutes long. In one of the intelligible portions of the voicemail, Defendant used the phrase "arrest me for breaking and entering," which the State characterized as an admission. Over Defendant's objection, the court admitted a 41-second portion and allowed it to be played for the jury.

¶7     The State also sought to admit Victim's written witness statement, which she had made immediately after the incident. The district court initially admitted the statement over Defendant's hearsay objection. After Defendant moved for a mistrial due to admission of the witness statement, the district court determined that the witness statement was hearsay and excluded it. However, the district court denied the motion for a mistrial. Later, while cross-examining Victim, Defendant

repeatedly questioned her credibility by pointing out that her testimony at trial included details not present in her written witness statement. Defendant also implied that Victim's $15,000 debt to Defendant gave her a motive to fabricate her allegations against him. The State again sought admission of the witness statement, and the district court agreed it should be admitted in its entirety.

¶8      During a recess in the trial, the judge informed counsel that she wanted to visit the jurors to explain the reasons for a delay; counsel acquiesced. When the judge returned, she stated on the record that she had done so in order to tell the jury that the recess had run longer than planned due to the preparation of jury instructions and that the State was deciding whether to put on any rebuttal. The judge also mentioned that the jurors had asked if they were going to be able to listen to the recordings of the voicemail and a 911 call[2] or have access to transcripts of them during deliberations. The judge reported that she had responded that there were no transcripts and that the judge and counsel would discuss whether the jurors would get to hear the recordings.

¶9      The court permitted the jury to hear the recording of the voicemail as well as the recording of Victim's 911 call during the jury's deliberations. The court explained that the prosecutor would have to show the bailiff how to play the recordings for the jury. Defense counsel did not object; rather, he merely asked that he be allowed to observe the prosecutor's instruction to the bailiff. The bailiff then played the recordings for the jury.

¶10      The jury convicted Defendant of burglary and acquitted him of a threat of violence charge. Defendant appeals.

---

2. This was apparently a reference to a recording of a 911 call Victim made after Defendant fled the house.

ISSUES AND STANDARDS OF REVIEW

¶11 Defendant first contends that the district court's burglary instruction was inadequate and misleading. "We review challenges to jury instructions under a correctness standard." *State v. Davis*, 2013 UT App 228, ¶ 15, 311 P.3d 538 (citation and internal quotation marks omitted).

¶12 Defendant next contends that the district court violated rule 403 of the Utah Rules of Evidence when it admitted a portion of a recording of a voicemail that he left for Victim about a week after the incident. We review a district court's "decision to admit or exclude evidence under Rule 403 of the Utah Rules of Evidence under an abuse of discretion standard, and will not overturn a lower court's determination of admissibility unless it is beyond the limits of reasonability." *State v. Williams*, 2014 UT App 198, ¶ 10, 333 P.3d 1287 (citation and internal quotation marks omitted). "[L]ike any other evidentiary ruling, an erroneous decision to admit or exclude evidence based on rule 403 cannot result in reversible error unless the error is harmful." *Id.* (citation and internal quotation marks omitted).

¶13 Defendant also contends that both the trial judge and the bailiff had improper contact with the jury during the trial. We review the propriety of communications between district court personnel and deliberating jurors for correctness, disturbing the verdict only if the error is "substantial or prejudicial such that the result would have been different had it not taken place." *Board of Comm'rs of Utah State Bar v. Petersen*, 937 P.2d 1263, 1267 (Utah 1997) (ellipsis, citation, and internal quotation marks omitted). Here, because defense counsel agreed to both the judge's and the bailiff's contact with the jury and did not later object, we consider Defendant's argument that defense counsel's assistance was constitutionally ineffective. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective

assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (brackets, citation, and internal quotation marks omitted).

¶14    Defendant further contends that the district court erred by admitting hearsay evidence in the form of Victim's witness statement. "In reviewing the admissibility of hearsay, legal questions are reviewed for correctness while the ultimate ruling on admissibility is reviewed for an abuse of discretion." *State v. Burke*, 2011 UT App 168, ¶ 16, 256 P.3d 1102. We review for an abuse of discretion a district court's decision to admit evidence pursuant to rule 106 of the Utah Rules of Evidence. *See State v. Montgomery*, 2007 UT App 24U, para. 4; *see also United States v. Lopez-Medina*, 596 F.3d 716, 734–35 (10th Cir. 2010) (considering the analogous federal rule).

¶15    Finally, Defendant contends that the cumulative effect of the alleged errors warrants reversal. Under the cumulative error doctrine, we apply the "standard of review applicable to each underlying claim of error" and "reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had." *Davis*, 2013 UT App 228, ¶ 16 (citations and internal quotation marks omitted).


ANALYSIS

I. Adequacy of Jury Instructions

A.    Instructions 25, 28, and 32 correctly and sufficiently stated the law.

¶16    Defendant first contends that the district court "gave inadequate and misleading instructions on burglary's 'intent to commit theft' element." Specifically, he asserts that the jury instructions "were insufficient and confusing because they failed to distinguish between the general and specific intent elements

of the offense and failed to explain that 'intent to commit theft' requires proof that the defendant entered/remained with the purpose to permanently deprive." Defendant concedes that the burglary instruction "correctly told the jury that burglary required proof beyond a reasonable doubt that [Defendant] entered/remained with the 'specific intent to commit a theft,'" but argues that the burglary and theft instructions, read together, "did not explain that this intent encompassed both the intent to unlawfully take *and* the purpose to permanently deprive."

¶17 "We review jury instructions in their entirety to determine whether the instructions, taken as a whole, fairly instructed the jury about the applicable law." *State v. Liti*, 2015 UT App 186, ¶ 12, 355 P.3d 1078. As relevant here, "[a]n actor is guilty of burglary who enters or remains unlawfully in a building . . . with intent to commit: . . . (b) theft [or] (c) an assault on any person[.]" Utah Code Ann. § 76-6-202(1) (LexisNexis 2012); *see also id.* § 76-6-202(2) (explaining that a burglary committed in a dwelling is a second-degree felony). Considering burglary by theft, "[a] person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." *Id.* § 76-6-404. "'Purpose to deprive' means to have the conscious object: (a) To withhold property permanently or for so extended a period or to use under such circumstances that a substantial portion of its economic value, or of the use and benefit thereof, would be lost[.]" *Id.* § 76-6-401(3).

¶18 "Instructions should be read in their entire context and given meaning in accordance with the ordinary and usual import of the language as it would be understood by lay jurors." *State v. Kennedy*, 2015 UT App 152, ¶ 28, 354 P.3d 775 (citation and internal quotation marks omitted). Here, the district court instructed the jury on intent (Instruction 25), the elements of burglary applicable to the charges against Defendant

(Instruction 28), and definitions relevant to burglary generally (Instruction 32). Instruction 25 described intent:

> A person engages in conduct intentionally or with intent or willfully with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result.

Instruction 28 then listed the elements the jury would have to find beyond a reasonable doubt before convicting Defendant of burglary:

> 1. In Salt Lake County, State of Utah, the defendant KEN JOHNSON;
> 2. Knowingly, intentionally or recklessly;
> 3. Entered or remained unlawfully in the dwelling of another; and
> 4. With the specific intent to commit:
>     a. A theft; or
>     b. An assault on any person.[3]

Finally, Instruction 32 provided definitions relevant to burglary:

> Theft. A person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof.

---

3. On appeal, Defendant does not challenge the jury instructions as to burglary by assault. The jury acquitted Defendant on a charge of making a violent threat, which suggests, but does not conclusively prove, that the burglary conviction was based on a theory of burglary by theft rather than burglary by assault.

"Purpose to deprive" means to have the conscious object:

> (a) To withhold property permanently or for so extended a period or to use under such circumstances that a substantial portion of its economic value, or of the use and benefit thereof, would be lost[.]

¶19    As explained above, Defendant claims that the jury could have believed that, if it found the "specific intent to commit [a] theft" element of the burglary instruction was satisfied, the "purpose to [permanently] deprive" element of the theft instruction was also satisfied. He asserts, "Consequently, the instructions might have led the jury to believe that 'intent to commit theft' could be satisfied by mere proof of the intent to unlawfully take."

¶20    Defendant's argument in this regard reverses the logical chain of the instructions. Instruction 28 told the jury that, to convict Defendant of burglary by theft, it had to find that he entered or remained in the house with the "specific intent" of committing theft. Therefore, the starting point of the jury's consideration of this issue must have been whether Defendant intended to commit a theft as defined by Instruction 32. Instruction 32 plainly informed the jury that theft required the "[p]urpose to [permanently] deprive." Accordingly, only if the jury first found that Defendant had the purpose to permanently deprive Victim of her property could it proceed to the question of whether Defendant entered or remained with the specific intent to carry out that purpose. When considered together, the instructions correctly informed the jury that (1) without the purpose to permanently deprive, there could be no theft, and (2) without the intent to commit theft, there could be no burglary-by-theft conviction. In other words, because the instructions conditioned a burglary-by-theft conviction upon a finding that Defendant had the specific intent to commit a theft (as Defendant concedes they did), the elements of theft (including

the purpose to permanently deprive) were necessarily part of the jury's consideration of the burglary instruction.

¶21    Defendant also argues that "the instructions failed to adequately explain that the intent to permanently deprive had to exist contemporaneously with the entering/remaining." But Instruction 28 explains that a burglary-by-theft conviction required the jury to find that Defendant "[e]ntered or remained unlawfully in the dwelling of another" "[w]ith the specific intent to commit" a theft. And Instruction 32 defines the intent element of theft as having "the conscious object . . . [t]o withhold property permanently." As explained above, Instruction 32's definition of "theft" logically must be read into Instruction 28's use of the term "theft." *See Kennedy*, 2015 UT App 152, ¶ 28 (explaining that instructions are given the ordinary and usual import of their language). Therefore, reading these instructions "in their entire context" and giving them "meaning in accordance with the ordinary and usual import of the language," *id.*, the only reasonable interpretation is that a burglary-by-theft conviction required a finding that, while entering or remaining in the dwelling, the defendant had the conscious object of withholding property permanently.

¶22    In a similar vein, Defendant refers us to a question sent by the jury to the court during deliberations. That note asked, with the jury's emphasis, "Does the person need to have intent before they enter the home to commit theft OR can intent happen after they are in the home?" The court responded, without consulting counsel,[4] "See instruction #31[.] Intent can be formed before

---

4. A court is not required to consult counsel before responding to a jury's question by simply referring the jury back to instructions already approved by counsel. *See State v. Dozah*, 2016 UT App 13, ¶ 25, 368 P.3d 863. However, such a course of action is risky because the court's response to a jury question may be construed as a new instruction. *See also id.* ¶¶ 26, 29, 31 (vacating a
(continued…)

entry or while remaining in the home." Instruction 31, approved by counsel, had informed the jury that "a person commits Burglary if that person enters or remains unlawfully in a dwelling or any portion of a dwelling with intent to ~~commit a felony~~ or theft or to commit an assault on any person." (Strikeout in original.) Defendant complains that the response "failed to explain that the requisite intent *must* be contemporaneous with the entering/remaining, instead advising the jury that it *can* be present at the time of the entering/remaining." (Emphasis in original.) He argues that, "[b]y including this non-mandatory language, the court's response suggested that intent could be formed after leaving the home."

¶23    However, there is no likelihood that the jury shared this interpretation of the note and response. The jury's note described two scenarios separated by the emphasized word "or." This indicates that the jury understood that one of those two scenarios must have existed before they could find that Defendant intended to commit theft. And the court's response referred the jury to an instruction previously given and clarified that either of the two scenarios would be sufficient for the jury to reach that finding. Given the phrasing of the note and the instructions before the jury, there is no reasonable possibility that the jury could have interpreted the court's response as modifying the initial jury instructions so as to make intent to commit theft while unlawfully entering or remaining an optional, rather than required, finding.

---

(…continued)

conviction where such a response, "despite the court's apparent intent to simply refer the jury back to the earlier instructions," could have been interpreted by the jury as a fresh and legally incorrect instruction). Responding to a jury's question without consulting counsel, while not in and of itself error, is a departure from the best practices for a court.

¶24 We conclude that the instructions on burglary and theft, when considered together, fairly instructed the jury about the applicable law and that Defendant has not shown a reasonable likelihood that the jury misinterpreted the court's response to the jury's note.

B.     Instruction 33 did not fatally cloud the jury instructions.

¶25 Defendant next argues that the "significance of Instruction 33 was not clear, and when considered with Instruction 32, it suggested that intent to temporarily deprive *was* sufficient to sustain a conviction." Instruction 33 was included in the court's instructions at the request of defense counsel. As initially proposed, the instruction first defined the offense of wrongful appropriation and then related that definition to Defendant's defense theory:

> A person commits wrongful appropriation if he obtains or exercises unauthorized control over the property of another, without the consent of the owner or legal custodian and with intent to temporarily appropriate, possess, or use the property or to temporarily deprive the owner or legal custodian of possession of the property.
>
> Therefore, if at the time [Defendant] unlawfully entered or remained in the building [Defendant] took the cell phone from [Victim] but acted with the intent to temporarily deprive her of the item, under the law he would be acting only with the intention to [temporarily] deprive and not to commit a theft. In such a circumstance [Defendant] could not be found guilty of burglary based on a theory of theft because burglary under a theory of theft requires that the defendant act with intent to permanently deprive the person of the property. An intention to temporarily deprive the person of

the property is not sufficient to support a burglary charge.[5]

. . .

If [Defendant] did not, while entering or remaining in the building, have the intent to commit a theft or an assault you must vote not guilty on the burglary charge[.]

¶26 The district court did not give this instruction in full. Specifically, it declined to include the portion explaining Defendant's "theory of the case" and stated that counsel would "have to make your own arguments" to the jury about the relevance of wrongful appropriation. Accordingly, the court gave only the first paragraph of Defendant's proposed instruction, defining wrongful appropriation. Defense counsel did not seek to withdraw the shortened version of Instruction 33.

¶27 Defendant now complains that "Instruction 33 defined 'wrongful appropriation' in the abstract without relating it to the legal principles relevant to burglary." Defendant asserts that Instruction 33 "did not tell the jury what really mattered: entering/remaining with the intent to temporarily deprive is *not* sufficient to satisfy burglary's intent element."

¶28 "Jury instructions require no particular form so long as they accurately convey the law." *State v. Maama*, 2015 UT App

---

5. *But see* Utah Code Ann. § 76-6-404 (LexisNexis 2012) (explaining that theft requires a "purpose to deprive"); *id.* § 76-6-401(3) (defining "'[p]urpose to deprive'" as having the conscious object to "withhold property permanently *or for so extended a period or to use under such circumstances that a substantial portion of its economic value, or of the use and benefit thereof, would be lost*" (emphasis added)).

235, ¶ 29, 359 P.3d 1272. The fact that one instruction, considered alone, is not as accurate as it could have been does not constitute reversible error so long as the instructions as a whole fairly instruct the jury on the applicable law. *State v. Kennedy*, 2015 UT App 152, ¶ 32, 354 P.3d 775; *State v. Lucero*, 866 P.2d 1, 3 (Utah Ct. App. 1993).

¶29　There can be no question that Instruction 33 correctly stated the law on wrongful appropriation; as given, it recited the wrongful appropriation statute verbatim. *See* Utah Code Ann. § 76-6-404.5(1) (LexisNexis 2012). And the law relating to burglary was already correctly stated by Instruction 28, which conditioned a burglary conviction on one of two intent findings—either "the specific intent to commit: a. A theft; or b. An assault on any person." Given the restrictive wording of Instruction 28, the jury could not have mistakenly read into the instructions a third route to a burglary conviction based on the intent to wrongfully appropriate. As a result, while the relevance of Instruction 33 could have been more thoroughly explained, the court did not err in giving the shortened version of Defendant's proposed instruction, because the jury instructions as a whole fairly instructed the jury on the applicable law. *See Kennedy*, 2015 UT App 152, ¶ 32; *Lucero*, 866 P.2d at 3.

¶30　Defendant also points to a second note that the jury sent to the court during its deliberations, which asked about the reason Instruction 33 was included at all: "Jury is confused about the reason for the addition of p.33. Is there a specific reason it is included?" Without consulting counsel, *see supra* ¶ 22 note 4, the court responded "Use your collective memory of counsel's argument[6] and testimony to determine its significance. See

6. Defense counsel ultimately did not make an argument to the jury that, while entering or remaining in the house, Defendant at most possessed the intent to commit wrongful appropriation, which would fall short of an intent to commit theft. Defendant

(continued…)

Instruction #11."[7] Defendant relies on *State v. Couch* for the proposition that, "'[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.'" 635 P.2d 89, 94 (Utah 1981) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612–13 (1946)). He argues that, here, the court could only have done so by responding that "the intent to temporarily deprive was insufficient to support a conviction."

¶31    This argument stretches *Couch* beyond its holding. There, in a sexual abuse and kidnapping case, the Utah Supreme Court held that a court's failure to instruct the jury upon its request as to the legal definition of the term "genitals," when that term had not been defined in the jury instructions given, was reversible error. Specifically, the supreme court explained that, "where a jury at its own instance requests the definition of a term whose understanding is essential to a proper application of the law, the trial judge must provide the requested definition." *Couch*, 635 P.2d at 95. In contrast, the jury's confusion here was not related to the meaning of a term in a statute but rather to the relevance of an instruction included at Defendant's request. The court responded that (1) the relevance of Instruction 33 might be found by reviewing the arguments made by Defendant's counsel and (2) if the jury's other findings made Instruction 33 irrelevant, it could "disregard that instruction." Accordingly, by reminding

---

(…continued)

does not argue that defense counsel's representation was constitutionally ineffective as a result.

7. Instruction 11 was a standard instruction that explained, as pertinent here, "All instructions are important, and you should consider them as a whole. . . . Whether any particular instruction applies may depend on what you decide are the true facts of the case. If an instruction applies only to facts or circumstances you find do not exist, you may disregard that instruction."

the jury that irrelevant instructions should be disregarded, the court cleared away "with concrete accuracy" the jury's confusion regarding the inclusion of an instruction whose relevance was suspect. Moreover, nothing in the note or response can plausibly be read as setting aside or loosening the restrictions of Instructions 25 and 32. As noted, those instructions correctly stated the law, *see supra* ¶¶ 24, 29; *see infra* ¶ 32, and Defendant was not "entitled to further instruction regarding the defense's theory of the case when the other instructions already fairly instruct[ed] the jury on the law applicable to that theory," *see Kennedy*, 2015 UT App 152, ¶ 32; *Lucero*, 866 P.2d at 3.

¶32   We conclude that Instruction 33 did not cloud the meaning of the instructions given to the jury, particularly in light of the district court's response, which reminded the jury that not every instruction was necessarily relevant.

## II. Admission of Voicemail Evidence

¶33   Defendant contends that the district court "violated evidence rule 403 by admitting an unfairly prejudicial recording of a message that [Defendant] left on [Victim's] voicemail about a week after the alleged offense."

¶34   The State sought admission of the entire recording, which was almost four minutes long. Defendant objected to the admission of the whole recording, arguing that it was unfairly prejudicial because it contained obscenities, but conceded that a 4-second portion, in which he stated "arrest me for breaking and entering [or] whatever the fuck they think," was admissible. He also offered to stipulate that he had kicked in Victim's door and forcibly entered the house. Nevertheless, the State sought admission of the recording, and the district court ruled that it would admit into evidence the 4-second portion "where he discusses coming into the house." The State explained that it would be difficult to cue the recording to that exact point. The court ended up admitting and playing a 41-second clip for the

jury, which included the 4-second portion. The 41-second clip was generally unintelligible but included fragmentary statements such as "there's nothing I owe you," "you're fucking me," and "[you're] stealing my house from me." Defendant moved for a mistrial on the ground that the State had played more than the 4-second portion and had exposed the jury to Defendant's use of the words "fuck" and "fucking." The court denied the motion after deciding that a mistrial was not warranted merely "because the f-word might have been heard along with [Defendant's] statements about kicking the door in."

¶35 The district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. "[U]nfair prejudice results only where the evidence has an undue tendency to suggest decision upon an improper basis." *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (citation and internal quotation marks omitted). Consequently, there is a "presumption in favor of admissibility." *Id.* (citation and internal quotation marks omitted).

¶36 Defendant asserts that the recording was substantially more prejudicial than probative. According to him, the probative value was low because he had stipulated that he had broken into the house and because he later testified to that effect. And on the other side of the equation, Defendant claims that the danger of unfair prejudice was high due to his use of obscenities and the fact that his statements were "directed against [Victim], exhibited extreme animosity and the jury could have believed that [Defendant] was indifferent to the impact of his unlawful entry upon her." (Citation and internal quotation marks omitted.)

¶37 We agree with the State that the recording had "substantial probative value" beyond Defendant's stipulation

that he had broken into the house. The recording was relevant to show why Defendant broke into Victim's house, as well as his general state of mind toward Victim and her property, albeit a week after the event. *Cf.* Utah R. Evid. 401 (explaining that evidence is relevant if it has any tendency to make a fact that is of consequence to the action more or less probable than it would be without the evidence). Defendant's apparent animosity to Victim, as revealed by his demeanor and use of obscenities in the recording, was therefore probative to central issues in both the assault and theft theories of burglary with which he was charged. Furthermore, stipulating to a fact does not cut off the State's right to present evidence depicting the context of that fact. *See State v. Verde*, 2012 UT 60, ¶ 28, 296 P.3d 673 (explaining that the State "retains wide discretion to reject" a defendant's offer to stipulate in lieu of presenting evidence to a jury "to preserve the right to present evidence with broad 'narrative value' beyond the establishment of particular elements of a crime"); *see also Old Chief v. United States*, 519 U.S. 172, 189 (1997) ("People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard.").

¶38    Turning to prejudice, the Utah Supreme Court has emphasized that "the probative value of the evidence must be *substantially* outweighed by the danger of *unfair* prejudice." *Lucero*, 2014 UT 15, ¶ 32 (emphasis in original) (citation and internal quotation marks omitted). Defendant asserts that his use of "coarse language could have caused the jury to convict based on a generalized assessment of character rather than the evidence." (Internal quotation marks omitted) (Citing *State v. Maurer*, 770 P.2d 981, 985–87 (Utah 1989)). In *Maurer*, the defendant wrote a letter to his victim's father in which he graphically described her cries during her murder and referred to her using a coarse slur. *Maurer*, 770 P.2d at 982. That letter was

introduced into evidence; on appeal, the Utah Supreme Court reversed the defendant's conviction because the letter "could have provoked an emotional response from the jury and provoked its instinct to punish or otherwise divert[ed] the jury from its task." *Id.* at 987. Defendant relies on *State v. Alzaga* for the proposition that the "core concern" identified by *Maurer* in an unfair prejudice analysis is "what the defendant's words revealed about his character." But in *Alzaga*, this court noted that "the core concern with the letter in *Maurer* was *not so much the letter's language* but what it revealed about the defendant's character: he wrote it to inflict additional emotional pain upon the victim's father, literally to add insult to injury." *State v. Alzaga*, 2015 UT App 133, ¶ 51, 352 P.3d 107 (emphasis added). Here, the import of the voicemail message was not that it was calculated to insult Victim or inflict emotional pain but rather that it showed Defendant's state of mind and cast light on the likelihood that he might have tried to assault Victim or to steal from her. And to the extent that Defendant worries that the jury might have convicted him for using coarse language, we note that such words "have lost much of their shock value in contemporary culture." *See id.* (affirming a district court's decision to admit into evidence a recording of a telephone call, between the defendant and his girlfriend, in which the defendant referred to his murder victim using several obscenities).

¶39　Defendant has not convinced us that the district court abused its discretion by deciding that the probative value of the 41-second recording was not substantially outweighed by the danger of unfair prejudice. Accordingly, we affirm the district court's resulting denial of Defendant's motion for a mistrial.

### III. Jury Contact

¶40　Defendant next contends that there was improper contact between the judge and the jury as well as between the bailiff and the jury. Specifically, he asserts that the judge "engaged in an

off-the-record conversation with the jury, without counsel present, about matters directly related to trial." He further asserts that the court "allowed the bailiff to remain in the jury room during deliberations." According to Defendant, these events create a "rebuttable presumption of prejudice that was not rebutted below."

¶41    Because defense counsel acquiesced to both contacts and did not object to them even after they occurred, we turn to Defendant's argument that defense counsel's assistance was constitutionally ineffective. To establish ineffective assistance of counsel, a defendant must demonstrate that defense counsel's performance was deficient and that the deficient performance prejudiced the defense. *Burke v. State*, 2015 UT App 1, ¶ 16, 342 P.3d 299 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Because both deficient performance and prejudice are requisite elements of a claim of ineffective assistance of counsel, failure to prove either element necessarily defeats the claim." *State v. Garcia*, 2016 UT App 59, ¶ 29, 370 P.3d 970. Defense counsel's performance is not deficient so long as there is a conceivable tactical basis for counsel's action or inaction. *Id.*; *State v. King*, 2010 UT App 396, ¶ 31, 248 P.3d 984 ("[B]efore we will reverse a conviction based on ineffective assistance of counsel, we must be persuaded that there was a lack of any conceivable tactical basis for counsel's actions." (citation and internal quotation marks omitted)).

A.    The judge–jury contact did not address substantive trial matters.

¶42    Defendant states that the judge's "improper contact" with the jury "surfaced after-the-fact when the judge returned from a recess," and she explained what she had talked to the jury about:

> I went in and told the jury that it had been longer than a 15 [minute] break because we were copying all the jury instructions and putting in the ones that

> you had all brought this morning that I had given
> you the opportunity to bring and the State was
> deciding whether to do rebuttal and all that and
> they said, "Well, when we get this case are we
> going to be able to listen to the tapes? Is there a
> transcript of the tapes?" So I said there's no
> transcripts of the tapes, we will discuss whether
> you get to hear the tapes.

However, immediately before going to speak to the jury, and recorded on the same page of the transcript, the judge had announced to counsel that "I'm going to tell the jury that we're working on all this, that there's no rebuttal. That we're going to be copying jury instructions so it may take a few minutes more than 15 so they don't blame it on you." Defense counsel responded, "Okay." Thus, defense counsel did not object to the judge–jury contact either when the judge announced her intent to talk to the jury or when the judge reported on the contents of that discussion.

¶43    With regard to judge–jury contact, the Utah Supreme Court has stated that "it may be appropriate to presume prejudice in some instances, such as where the judge discusses substantive matters with jurors." *State v. Maestas*, 2012 UT 46, ¶ 70, 299 P.3d 892. This is because, "[i]n such cases, the judge's communication may have influenced the jury in unknown ways that could potentially affect the outcome of the case." *Id.* But in *Maestas*, the supreme court declined to presume prejudice because "the interaction was brief and dealt with the timing of the jury's dismissal for the day." *Id.* "Further, to the extent that this communication could be considered related to some aspect of the trial, the judge appropriately disclosed the communication and neither [the defendant] nor his counsel objected to the interaction." *Id.* (internal quotation marks omitted).

¶44    Here, Defendant asserts, "The judge's off-the-record conversation with the jury involved 'substantive matters,' not

mere trial logistics . . . ." But the matters the judge talked to the jury about were exactly trial logistics. The judge explained to the jury why the break was longer than planned and that the State had not decided whether to offer rebuttal, and she responded to a jury question about what exhibits they would have access to by telling them that the judge and counsel had not yet decided that issue. *See, e.g., Maestas*, 2012 UT 46, ¶ 70 n.62 (giving as an example of discussing substantive matters with jurors a case where the foreman of a deadlocked jury discussed the jury's deadlock with the judge and "carried away from the meeting an impression that the judge wanted a verdict one way or the other" (citation and internal quotation marks omitted)). The term "substantive" refers to the merits or outcome of a legal claim or case, as opposed to timing or procedural matters. *See, e.g., id.; Beehive Tel. Co. v. Public Service Comm'n*, 2004 UT 18, ¶ 30, 89 P.3d 131; *Allen v. Friel*, 2008 UT 56, ¶¶ 23–24, 194 P.3d 903. And the judge here did not discuss the merits of the issues or the case with the jury.

¶45    Defendant argues that "the discussion concerning the State's decision whether to do rebuttal—coupled with the fact that the State did not put on a rebuttal—conveyed the impression that the State's case was a 'slam dunk' and the defense was weak and not worthy of a rebuttal." But the "slam dunk" danger Defendant highlights could only have arisen if the judge had informed the jury that the State would not be presenting rebuttal, rather than simply explaining that the State had not yet decided whether it would. And even if the judge had so informed the jury, identifying possible prejudice would be difficult where there is no indication that the judge expressed any opinion as to whether it was a wise decision. Moreover, the fact that the State ultimately did not present a rebuttal argument spoke volumes more to the jury than the judge's earlier comment that the State was still deciding whether or not to do so.

¶46    Defendant also argues that the judge–jury contact "could have 'bre[d] a sense of familiarity' with the judge" as evidenced

"from the various notes the jury sent to the court during deliberations." (Alteration in original) (Citing *State v. Pike*, 712 P.2d 277, 281 (Utah 1985)). However, juries often send notes to judges seeking clarification of their instructions and conveying their logistical concerns; we cannot presume that whenever this occurs, the jury has an improper sense of familiarity with the judge. *See Rushen v. Spain*, 464 U.S. 114, 118 (1983) ("There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial."). Moreover, in *Pike*, the Utah Supreme Court expressed discomfort at the potential for "breeding a sense of familiarity" when jurors and "an important prosecution witness," who was also the arresting officer, engaged in conversation during a recess. *Pike*, 712 P.2d at 280–81. Because a jury must evaluate the credibility of witnesses during deliberations, a sense of familiarity with a particular witness is "sufficient to warrant a presumption of prejudice." *Id.* at 281. But because a jury's charge does not encompass evaluating the credibility of the judge, the likelihood of the dangers posed by a sense of a familiarity with the judge, should one arise, is much less clear. Thus, the *Pike* standard for presuming prejudice on the basis of possible familiarity between witnesses and juries has little bearing here.[8]

¶47    Defendant further argues that the judge's use of the phrase "and all that" "demonstrates that the conversation encompassed more than an incidental conversation related to scheduling." We cannot divine such detail from an everyday informalism and therefore reject this argument without further discussion.

---

8. We reiterate that the best practice for a court is to minimize any contact or communication between the judge and the jury outside the presence of counsel. See *supra* ¶ 22 note 4.

¶48　We do not agree with Defendant's assertion that the judge–jury contact encompassed substantive matters. Accordingly, no presumption of prejudice arose. Defense counsel did not perform deficiently by agreeing to the contact, especially in light of its purpose—to ensure that the jury did not blame counsel for the delay. And because substantive matters were not discussed, defense counsel did not perform deficiently by failing to raise an objection when the judge reported back.

B.　The bailiff–jury contact did not create a presumption of prejudice.

¶49　Defendant claims that the "bailiff's contact with the jury also raises a presumption of prejudice that cannot be rebutted." Specifically, he notes that the court asked the prosecutor to show the bailiff how to play the 911 call and voicemail recordings and that the court stated "probably just the bailiff will go in." Defense counsel did not object. Defendant asserts that the "bailiff's contact with the jury was more than incidental because the record reveals that the bailiff was present while the jury actually deliberated."[9]

¶50　Defendant points us to *State v. Jonas*, 793 P.2d 902 (Utah Ct. App. 1990), in which this court addressed a somewhat similar situation. There, after the close of evidence but before the jury was instructed and before closing arguments, a juror was excused from the panel. *Id.* at 907. The juror asked the bailiff to

---

9. Despite Defendant's assertion, the record on appeal does not reveal whether the bailiff remained in the room during the playing of the recordings. Nor does it reveal whether the jury discussed the case during the playing of the recordings. Given the short length of the recordings, as well as the need to prevent the jury from hearing unadmitted portions, we will assume arguendo that the bailiff remained in the room while the recordings were played.

explain his absence to the remaining jurors, which the bailiff did. *Id.* The defendant appealed on the ground of improper bailiff–jury contact. *Id.* at 903. This court determined that no presumption of prejudice arose, because the bailiff "did not mingle with the jurors or converse with them about the trial itself; nor did he interrupt their deliberations." *Id.* at 909. Defendant contrasts the instant case, asserting that "this is not a case where the bailiff simply entered the deliberation room, performed the ministerial task of cuing up the audiotape, and exited." (Citation and internal quotation marks omitted.) *But see supra* ¶ 49 note 9.

¶51    We find *United States v. Freeman* instructive. *See* 634 F.2d 1267 (10th Cir. 1980). In *Freeman*, the Tenth Circuit Court of Appeals reversed a defendant's conviction after an FBI agent was allowed into the jury room to "operate the sound equipment" necessary to replay certain recordings previously admitted into evidence. *Id.* at 1269–70. That decision turned on the fact that the FBI agent was an adversary because his investigation had led to the prosecution of the defendant. *Id.* at 1268–69; *see also id.* at 1269 ("[A]ccess to the jury during its deliberative process by any adversary simply cannot be tolerated." (citation and internal quotation marks omitted)). *But see United States v. Florea*, 541 F.2d 568, 571–72 (6th Cir. 1976) (holding that the presence of an adversary party performing a similar function in the jury room was harmless error because he "was never alone with the jury and was in its presence only long enough to replay the tapes").

¶52    Here, there is no evidence that the bailiff remained in the jury room after playing and stopping the recordings. Nor is there any evidence that the bailiff mingled with the jurors, conversed with them about the trial, or interrupted their discussions. And a bailiff, unlike an FBI agent, is a member of the court's personnel and not an adversary party in the proceeding. For these reasons,

we will not presume prejudice.[10] Defense counsel thus did not perform deficiently by acquiescing to the plan of having the bailiff play the recordings for the jury.[11]

¶53    Because defense counsel did not perform deficiently with regard to either the judge–jury contact or the bailiff–jury contact, we conclude that there was no reversible error.

## IV. Admission of Hearsay Evidence

¶54    Defendant next contends that the district court inappropriately admitted Victim's written witness statement into evidence. Specifically, Defendant argues that the witness statement was hearsay and was not a prior consistent statement, because it was written after Victim had formed the motive to fabricate her allegations against Defendant. Defendant further argues that the rule of completeness did not apply to allow the admission of hearsay, because no portion of the witness statement had previously been entered into evidence.

¶55    During Victim's testimony, the State sought to enter into evidence the written witness statement Victim gave to police on the day of the incident. Defense counsel objected on hearsay grounds, but the court overruled the objection after determining that rule 801(d)(1)(A) of the Utah Rules of Evidence applied. *See generally* Utah R. Evid. 801(d)(1)(A) (providing that a statement is not hearsay if it "is inconsistent with the declarant's testimony

---

10. We note that an automatic presumption of prejudice in such circumstances would hinder the ability of court personnel to assist juries with technical matters.

11. Indeed, he likely had a tactical reason for accepting the plan; if the jurors had simply been given the recordings, they might have listened to the portions defense counsel had succeeded in excluding from evidence.

or the declarant denies having made the statement or has forgotten"). The witness statement was then published to the jury. However, after a recess, the district court realized it had misread rule 801(d)(1)(A) as requiring consistency rather than inconsistency and therefore reversed itself. Accordingly, the district court retracted the written statement from the jury but declined to declare a mistrial because the jury only had the statement "for two minutes."

¶56    While cross-examining Victim, defense counsel asked her several times about the written statement in an attempt to impeach Victim's credibility by highlighting discrepancies between Victim's direct examination testimony and the statement she gave on the day of the incident. For example, after Victim testified that Defendant had "grabbed" her, defense counsel asked, "[I]sn't it true that there's not one word in your report about him grabbing you?" After Victim stated that she could not recall, defense counsel refreshed her memory by showing her the written statement and asked, "[I]sn't it true that the word grab, grabbing, grabbed, none of those words appear in that statement . . . ?" Defense counsel then got Victim to agree that the police detective had instructed her to "write down what happened" and to "tell him everything." Similarly, after Victim testified that Defendant had "throw[n] punches in the air towards my face, like he was going to punch me but stopped," defense counsel asked her, "And that doesn't appear anywhere in your report there either, does it?" Victim admitted it did not, explaining that she had not remembered that portion of the incident until later.

¶57    After Victim was excused from the witness stand, the State again sought to have the written statement admitted into evidence. The court admitted it into evidence pursuant to rule 801(d)(1)(B). *See* Utah R. Evid. 801(d)(1)(B) (providing that a statement is not hearsay if it "is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent

improper influence or motive in so testifying"). Defense counsel objected that only the portions of the statement that were consistent with the challenged elements of Victim's testimony were admissible under that rule. Then the court admitted the entire written statement into evidence because defense counsel had "referred too much to the statement" and could not "keep pulling bits and piece[s] of it out and expect that it's not going to go into evidence." *See* Utah R. Evid. 106. The court also expressed concern that the cross-examination had taken "a bunch of stuff out of context."

¶58　Victim's witness statement was then introduced into evidence as an exhibit:

> My ex husband came to my home drunk. I did not want to answer the door. He started kicking the back door. I grab[b]ed my phone and was yelling at him to leave. He broke the door in. I called 911 and he took my phone and would not give it back. He was still yelling at me telling me I owe him money and I will not get it back. We got to the front door and I was still trying to get my phone back to call 911. He pushed me and said he should just push me down the stairs. He got in his truck and I ran to [my] neighbors house.

¶59　The basis for applying rule 106 here was not that elements of the witness statement were admissible pursuant to rule 801(d)(1)(B). Rather, the beachhead was defense counsel's extensive reliance on portions of the witness statement to impeach Victim's credibility. Thus, regardless of whether the witness statement properly fell within the ambit of rule 801(d)(1)(B), the question before us is whether the district court

abused its discretion in determining that rule 106 required the admission of the remainder of the witness statement.[12]

¶60 Rule 106 of the Utah Rules of Evidence provides, "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." This rule is often referred to as the rule of completeness, and is designed "to prevent a misleading impression created by taking

---

12. "At least seven circuits have held . . . that if a remainder [portion of a statement] passes the fairness test, no other rule of evidence should exclude it from being entered under Rule 106." Michael A. Hardin, *This Space Intentionally Left Blank: What To Do When Hearsay and Rule 106 Completeness Collide*, 82 Fordham L. Rev. 1283, 1308 (2013) (considering the federal rule of evidence analogous to rule 106). "These [circuits are] the D.C., First, Second, Third, Fourth, Seventh, and Tenth Circuits." *Id.* Hardin goes on to point out that of the five circuits that have appeared to hold that the rule of completeness does not trump other restrictions on the admissibility of evidence, at least four have done so only in dicta. *Id.* at 1312 ("A particular pattern emerges in these cases. Courts of this view often state that Rule 106 cannot render inadmissible remainders admissible, but then go on to find other reasons not to admit the remainder[.]"). Moreover, "[t]he Supreme Court [has] ducked this issue by holding that whether or not it was usable under Rule 106 [of the Federal Rules of Evidence], a party could introduce the remainder of a truncated letter as part of his own case under the common law completeness doctrine." 21A Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5078.1 (2d ed. 2016) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170–73 (1988)). *See also State v. Sanchez*, 2016 UT App 189, ¶ 24 n. 4 (collecting cases).

matters out of context." *See State v. Jones*, 2015 UT 19, ¶ 40, 345 P.3d 1195 (citation and internal quotation marks omitted). "The rule establishes a fairness standard that requires admission of those things that are relevant and necessary to qualify, explain, or place into context the portion already introduced." *Id.* (citation and internal quotation marks omitted). We therefore consider whether rule 106's fairness standard required the admission of the entirety of Victim's witness statement.

¶61 Defendant asserts that the written statement is not admissible in its entirety even in light of rule 106. He argues that rule 106 only renders admissible those portions of the written statement that were directly relevant to the precise items of testimony impeached by defense counsel's cross-examination.

¶62 The State responds that "[f]airness required admission of [Victim's] entire witness statement." The State explains that the thrust of defense counsel's cross-examination was to suggest that Victim's "*entire testimony* was unreliable because she could not accurately report the events" and to suggest "that she was embellishing her testimony with events that did not happen because her witness statement alone did not fully support Defendant's charges." (Emphasis added.) According to the State, in light of defense counsel's attempts to impeach Victim's overall credibility, the only way to "rebut these suggestions" was to let the jury "see exactly how [Victim] had described the events in her written statement."

¶63 We agree with the State. The intent behind rule 106 is "to prevent a misleading *impression*," not simply to correct a specific misleading instance. *See Jones*, 2015 UT 19, ¶ 40 (emphasis added) (citation and internal quotation marks omitted). Applying rule 106's fairness standard here required allowing the State to introduce enough of the written statement to not only counter defense counsel's tactical attacks on specific elements of Victim's testimony but also to fairly respond to his strategic aim of impeaching Victim's credibility generally.

¶64    We conclude that the district court did not abuse its discretion when it determined that rule 106's fairness standard required admission of the entirety of Victim's written witness statement. *See id.* ("The rule establishes a fairness standard that requires admission of those things that are relevant and necessary to qualify, explain, or place into context the portion already introduced." (citation and internal quotation marks omitted)).

## V. Cumulative Error

¶65    Defendant contends that the cumulative error doctrine requires reversal here due to the aggregated prejudicial effects of the errors alleged. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Davis*, 2013 UT App 228, ¶ 106, 311 P.3d 538 (citation and internal quotation marks omitted). We have determined that the district court did not err or abuse its discretion with regard to the claims in Parts I, II, and IV.[13] We have also determined that no presumption of prejudice arose with regard to the improper jury contact claims in Part III, and that defense counsel did not perform deficiently with respect to those claims. Accordingly, there are not multiple instances of prejudice to cumulate, and Defendant's cumulative error claim necessarily fails. *See State v. Glasscock*, 2014 UT App 221, ¶ 34, 336 P.3d 46.

---

13. Given our resolution of each of these contentions on its merits, we need not and do not address the parties' subsidiary arguments as to whether those contentions were preserved or whether an exception to the preservation requirement applies.

CONCLUSION

¶66  The jury instructions given by the district court were neither inadequate nor misleading, when considered in their entirety. The district court did not abuse its discretion by admitting the voicemail recording, because the recording was not substantially more prejudicial than probative. Defense counsel did not perform deficiently with regard to the contacts between the judge and the jury and between the bailiff and the jury. The district court also did not abuse its discretion in determining that Utah Rule of Evidence 106 required the admission of the entirety of Victim's written witness statement. And the cumulative error doctrine has no application in the absence of error, abuse of discretion, or ineffective assistance of counsel.

¶67  Affirmed.

_____